854 F.2d 1338
 129 L.R.R.M. (BNA) 2001, 1988 A.M.C. 2409,
272 U.S.App.D.C. 129,
57 USLW 2147, 109 Lab.Cas. P 10,681
 NEW YORK SHIPPING ASSOCIATION, INC., International
Longshoremen's Association, AFL-CIO, Council of North
Atlantic Shipping Associations, Atlantic Container Line,
Ltd., Dart Containerline Company, Limited, Hapag-Lloyd
Aktiengesellschaft, "Italia" S.P.A.N., Nedlloyd Lines B.V.,
Puerto Rico Maritime Shipping Authority, Sea-Land Service,
Inc., Trans Freight Lines, Inc., and United States Lines,
Inc., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents.
NEW YORK SHIPPING ASSOCIATION, INC., et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
American Trucking Assoc., Inc., American Warehousemen's
Assoc., West Gulf Maritime Assoc., National Customs Brokers
& Forwarders Association of America, Inc., International
Association of NVOCCs, et al., Intervenors.
 Nos. 82-1347, 87-1370.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 17, 1987.
Decided Aug. 9, 1988.
 
 Donato Caruso, with whom C.P. Lambos, New York City, for New York Shipping Association, Inc.; William Karas, Washington, D.C., for Atlantic Container Line, Ltd.; Thomas W. Gleason and Ernest L. Mathews, Jr., New York City, for Intern. Longshoremen's Ass'n, AFL-CIO; Robert S. Zuckerman, Edison, N.J., for Sea-Land Service, Inc.; Francis A. Scanlan, for Council of North Atlantic Shipping Associations, were on the joint brief, for petitioners. Nicholas G. Maglaras, New York City, also entered an appearance for New York Shipping Ass'n, Inc. in 87-1370. Edwin Longcope and Allan J. Berdon, New York City, also entered appearances for petitioner, Dart Containerline Co., in 82-1347.
 James W. Pewett and Ronald A. Capone, Washington, D.C., entered appearances for petitioner Puerto Rico Maritime Shipping Authority in 82-1347.
 Stanley O. Sher, John R. Attanasio and Robert A. Hazel, Washington, D.C., entered appearances for petitioners, Hapag-Lloyd Aktiengesellschaft, "Italia" S.P.A.N. and Nedlloyd Lines in 82-1347.
 John C. Cunningham, Atty., Federal Maritime Com'n, with whom Robert D. Bourgoin, Gen. Counsel, Federal Maritime Com'n, Robert B. Nicholson, Robert J. Wiggers, Attys., Dept. of Justice and Gordon M. Shaw, Atty., Federal Maritime Com'n, Washington, D.C., were on the brief, for respondents. C. Jonathan Benner, Atty., Federal Maritime Com'n, Washington, D.C., also entered an appearance for respondent, Federal Maritime Com'n, in No. 82-1347.
 Gerald Ullman, New York City, for Nat. Customs Brokers and Forwarders Ass'n of America, Inc., with whom, Kenneth E. Siegel, Kevin M. Williams, Alexandria, Va., for American Trucking Associations, Inc.; William H. Towle, for American Warehousemen's Ass'n; Raymond P. deMember, Fairfax, Va., for Intern. Ass'n of NVOCC's and Florida Customs Brokers and Forwarders Ass'n, were on the joint brief, for intervenors, American Trucking Ass'n, Inc., et al. in 87-1370. Daniel R. Barney, Alexandria, Va., also entered an appearance for intervenor, American Trucking Ass'n, Inc., in 87-1370.
 R. Frederic Fisher, Lawrence N. Minch, San Francisco, Cal., and Richard D. Gluck, Washington, D.C., were on the brief, for intervenor, West Gulf Maritime Ass'n, in 87-1370.
 Before BUCKLEY and D.H. GINSBURG, Circuit Judges and MARKEY,* Chief Judge.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 These two petitions for review require us to revisit the legal imbroglios arising from a collective bargaining agreement between the International Longshoremen's Association (ILA) and ocean common carriers, known as the Rules on Containers. The Rules implement, in ports along the Eastern Seaboard and the Gulf of Mexico, a technological innovation in the ocean shipping industry referred to as "containerization." The Supreme Court has held that the Rules are a valid work preservation agreement under the federal labor laws, in a case where the "difficult and complex problems" that the Rules pose under the federal shipping laws were "not properly before [the Court]." NLRB v. International Longshoremen's Ass'n (ILA I), 447 U.S. 490, 512, 100 S.Ct. 2305, 2317, 65 L.Ed.2d 289 (1980). These shipping law problems are now ripe for our consideration.
 
 
 2
 The only issue in No. 82-1347 is whether the Commission properly assumed jurisdiction over the provisions of the Rules filed in carrier tariffs.[1] In No. 87-1370, we review the Commission's decision on the merits that certain shipping practices mandated by the collectively bargained for Rules violate, as published in tariffs, the shipping laws.[2]
 
 
 3
 The Commission held that its regulatory jurisdiction extends to those provisions of the Rules that must be published in the tariffs of the signatory carriers. In exercising that jurisdiction, the Commission concluded that "any effort ... to balance 'labor considerations' against the clear evidence of unreasonable transportation burdens and discriminations before [it] would represent a failure ... to discharge the duties assigned to [it] by Congress...." "50 Mile Container Rules" Implementation by Ocean Common Carriers Serving U.S. Atlantic and Gulf Coast Ports, 24 Shpg.Reg.Rep. (P & F) 411, 415 (1987) (hereinafter 50-Mile Rules ). Analyzing the Rules under "traditional transportation factors," the Commission held that the shipping practices mandated by the Rules were unreasonable and unjustly discriminated against certain classes of shippers. Accordingly, the respondent carriers were ordered to cease and desist from publishing the Rules in their tariffs and from enforcing them. In Part I of this opinion, we discuss the background to this dispute, containerization and its effect on the shipping industry, the Rules and prior litigation surrounding them, and the proceedings before the Commission in this case. In Part II, we determine that this court has jurisdiction over the petition for review in No. 82-1347, and that the Commission properly assumed jurisdiction over the Rules as carrier tariffs. In Part III, we uphold the Commission's conclusion that the Rules were unreasonable and discriminatory insofar as transportation criteria alone are considered, and approve its determination to exclude from its analysis the labor policy considerations urged upon it by petitioners.
 
 
 4
 Having found that the Commission's decisions concerning both the scope of its jurisdiction and the substantive validity of the Rules are consistent with its statutory mandate, and that substantial evidence supports its ruling on the merits, we deny the petitions for review.
 
 I. BACKGROUND
 
 5
 The introduction of container technology revolutionized the maritime shipping industry, altering in fundamental ways the methods by which large quantities of ocean-bound cargo are handled and transported. It has been hailed as "the single most important innovation in ocean transport since the steamship displaced the schooner." ILA I, 447 U.S. at 494, 100 S.Ct. at 2308 (quoting Ross, Waterfront Response to Technological Change: A Tale of Two Unions, 21 Lab.L.J. 397, 398 (1970)).
 
 A. Containerization and the Rules
 
 6
 Containerization is important to the shipping industry primarily because it is an efficient intermodal means of transporting ocean-bound cargo to and from inland origins or destinations. Both shippers (those seeking to have cargo transported) and carriers (those actually transporting the cargo) benefit from the efficiencies of containerization. Before containerization was implemented, all cargo to be shipped by ocean common carriers was transported to the pier from inland origination points by truck or railcar. The loose, or "break-bulk," cargo was there unloaded by employees of the ocean carriers or of stevedoring companies, known as longshoremen. These workers then transferred the cargo piece by piece to the ship. This process is self-evidently labor-intensive, requiring longshoremen to check and sort the cargo, place it on pallets, hoist it by means of a forklift or hook onto the deck of the ship, and stow it into the ship's hold. For incoming cargo, the process was essentially reversed.
 
 
 7
 Containers eliminate much of the on-pier handling of cargo. They are large metal receptacles that can be loaded (or in the parlance of the trade, "stuffed") at off-pier facilities, attached to a truck chassis or a rail flatcar at those facilities, transported to a pier, and finally, loaded directly into specially designed "container ships." The containers can likewise be removed from the ship and transported directly to the ultimate consignee for unloading (or "stripping"). Containers thus link land-bound methods of transportation to ocean-bound methods, with obvious advantages:
 
 
 8
 The use of containers is substantially more economical than traditional methods of handling cargo. Because cargo does not have to handled and repacked as it moves from the warehouse by truck to the dock, into the vessel, then from the vessel to the dock and by truck or rail to its destination, the costs of handling are significantly reduced. Expenses of separate export packaging, storage, losses from pilferage and breakage, and costs of insurance and processing cargo documents may also be decreased. Perhaps most significantly, a container ship can be loaded or unloaded in a fraction of the time required for a conventional ship. As a result, the unprofitable in-port time of each ship is reduced, and a smaller number of ships are needed to carry a given volume of cargo.
 
 
 9
 ILA I, 447 U.S. at 494-95, 100 S.Ct. at 2308-09 (footnotes omitted). See generally Note, Containerization and Intermodal Service in Ocean Shipping, 21 STAN.L.REV. 1077, 1078 (1969).
 
 
 10
 The efficiencies of containerization as a means of transporting cargo between shippers and carriers have also been exploited by various cargo-handling businesses. "Non-vessel operating common carriers" (NVOs), also referred to as consolidators, offer container services to shippers with less than containerload quantities of cargo to transport. These shippers would otherwise have to transport their cargo by traditional, labor-intensive methods. The costs of shipping such smaller loads are much higher than the costs of transporting cargo in containers, not only because pier-side labor costs generally exceed off-pier labor costs, but also because break-bulk cargo is subject to higher carrier rates than containerized cargo.
 
 
 11
 An NVO offers the advantages of containerization to a shipper with less than containerload quantities of cargo by consolidating its cargo with that of other shippers, stuffing it into one container, and transporting it under a single bill of lading at container rates. When the container is delivered by the ocean carrier to its port destination, it is forwarded to the NVO's facilities where the cargo in it is sorted and transported to its various consignees. NVOs perform these consolidation and deconsolidation functions at their own facilities, or by contract with independent warehousemen or trucking companies, or less frequently, by delivering consolidated shipments break-bulk to the pier where they are stuffed into containers by longshoremen in the first instance. NVOs take their profits by charging rates within the margin between carrier rates applicable to break-bulk shipments (which the smaller shippers would otherwise have to pay) and special "freight-all-kinds" rates governing consolidated containerloads. Shippers obtain additional advantages from NVOs, including "shorter delivery times, a single bill of lading, reduced risks of loss, damage, and pilferage at dockside, and specialized services not provided by the [ocean carriers]." Council of North Atlantic Shipping Ass'ns v. FMC (CONASA), 672 F.2d 171, 174 (D.C.Cir.1982) (footnotes omitted).
 
 
 12
 Despite the beneficial effects of containerization in terms of pierside productivity and transportation efficiency,containerization has not been an unalloyed blessing to the shipping industry. As is typically the case when innovative labor-saving devices become available to industry, container technology has had a considerable impact on workers. The longshore trade has been noticeably and severely affected. "In the Port of New York alone, ... annual [longshore] employment slipped from 43,000,000 man-hours in 1958 to less than 20,000,000 in 1977 while the annual volume of cargo shipped through the port doubled." American Trucking Ass'ns v. NLRB, 734 F.2d 966, 969 (4th Cir.1984), aff'd sub nom., NLRB v. International Longshoremen's Ass'n (ILA II), 473 U.S. 61, 105 S.Ct. 3045, 87 L.Ed.2d 47 (1985); see CONASA, 672 F.2d at 174-75. As a consequence, containerization has created deep divisions between the ILA and ocean common carriers; it has been a "hotly disputed topic of collective bargaining." ILA I, 447 U.S. at 496, 100 S.Ct. at 2309.
 
 
 13
 The Rules on Containers, the relevant portions of which are set out in Appendix A to this opinion, are the result of that collective bargaining, pitting carriers, seeking fully to implement container technology, against the ILA, bargaining to preserve jobs for its members. An agreement between these competing interests was reached only after intervention by a presidentially-appointed mediator and a bitter strike in 1968 that lasted 57 days in the Port of New York and more than 100 days in the Gulf ports. See CONASA, 672 F.2d at 175-76.
 
 
 14
 The Rules create zones with a 50-mile radius from designated points at each ILA port along the Atlantic and Gulf coasts. The Rules require that all container-load cargo originating from or destined to locations within the zones be stuffed or stripped at the pier by ILA longshoremen. Exceptions are made for containers stuffed with mail, personal belongings of individuals taking up residence overseas, and the personal effects of military personnel.
 
 
 15
 The Rules also exempt export and import cargo in full containers that have been stuffed by "qualified shippers and consignees" and meet certain other requirements. A qualified shipper is defined in the Rules as a "manufacturer or seller having a proprietary interest (other than in the transportation or physical consolidation or deconsolidation) in the export cargo being transported and who is named in the dock/cargo receipt." A qualified consignee, likewise, is defined as a "purchaser or one who has a proprietary financial interest (other than in the transportation or the physical consolidation or deconsolidation) in the import cargo being transported and who is named in the delivery order." The other requirements are that the container must be stuffed or stripped, respectively, at the qualified shipper's or the qualified consignee's own facilities by its own employees. An additional exemption is provided for full container-load import cargo of a qualified consignee stripped at a "bona fide public warehouse" within the 50-mile zones.
 
 
 16
 The Rules prohibit ocean carriers from furnishing containers to NVOs or other consolidators or deconsolidators. As a result, these NVOs must lease or purchase containers from other suppliers if they choose to deliver containerized cargo to the pier.[3] By contrast, carriers furnish containers at no charge to "qualified" shippers and consignees, as well as to shippers and manufacturers outside the 50-mile zones.
 
 
 17
 The Rules are enforced through an elaborate system of reporting requirements and penalties. Shippers must submit documentation enabling the carriers to determine whether the shippers' containers are exempt from pier-side stuffing and stripping. If a shipper delivers a stuffed, non-exempt container to the pier, it must be stripped and restuffed into the same container by ILA workers, at a cost that varies from $200 to $325 per container, depending upon its size.[4] The Rules do not require that these costs be passed on to the nonconforming shipper, but generally it is the shipper who pays. Should a nonexempt container surreptitiously pass over the pier, the ocean carrier transporting it is subject to a penalty of $1000.
 
 
 18
 The generally accepted net result of the Rules is that "about 20 percent of the containerized cargo [is preserved] to the longshoremen for stuffing and stripping, with the remaining 80 percent passing over the piers intact." 50-Mile Rules, 24 Shpg.Reg.Rep. at 417; see CONASA, 672 F.2d at 176.
 
 B. Prior Litigation Over the Rules
 1. Labor Law Issues
 
 19
 Between 1973 and 1979, the NLRB entertained a series of challenges to the Rules under sections 8(e) and 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. Secs. 158(e) & 158(b)(4)(B) (1982). Those provisions generally proscribe union activity, unilateral or in concert with an employer, that is intended to have "secondary" effects--i.e., that seeks to affect labor or business relationships outside its own collective bargaining relations. Specifically, truckers and consolidators alleged that the Rules were an illegal "hot cargo" agreement--a form of prohibited secondary activity--because the ILA was attempting to obtain for its members work that had traditionally been performed at off-pier facilities. The union and the carriers, by contrast, argued that the Rules were not intended to be a vehicle for securing for longshoremen work that had traditionally been performed by truckers or consolidators; instead, they maintained that the work in question was analogous to work falling within the ILA's traditional jurisdiction. In their view, the Rules were thus a valid "work preservation" agreement.
 
 
 20
 The NLRB defined the work in dispute as "the off-pier stuffing and stripping of containers." See, e.g., International Longshoremen's Ass'n (Dolphin Forwarding, Inc.), 236 N.L.R.B. 525, 526 (1978). With the work so defined, the NLRB agreed with the complaining parties that the Rules were an unlawful attempt by the ILA to acquire extra-jurisdictional work. It consequently ordered the ILA and certain signatory carriers to cease and desist from enforcing the Rules. This court, however, in International Longshoremen's Ass'n v. NLRB, 613 F.2d 890 (D.C.Cir.1979), declined to enforce an NLRB cease and desist order against the Rules.
 
 
 21
 The Supreme Court affirmed our decision, holding that the NLRB had misapplied the "work preservation doctrine." ILA I, 447 U.S. at 507-11, 100 S.Ct. at 2315-17. According to the Court, the NLRB "ignore[d] the fact that the impact of containerization occurred at the interface between ocean and motor transport...." The work in question, therefore, could reasonably be regarded as work traditionally performed either by longshoremen or by off-pier trucking and cargo-handling businesses. The Court remanded the case for the NLRB to consider in the first instance "whether the historical and functional relationship between this retained work and traditional longshore work can support the conclusion that the objective of the [Rules] was work preservation rather than the satisfaction of union goals elsewhere." Id. at 508, 100 S.Ct. at 2315. After the NLRB had reconsidered the matter, the Supreme Court revisited the issue, holding that the Rules in their entirety are a permissible work preservation agreement. ILA II, 473 U.S. at 84, 105 S.Ct. at 3058.
 
 
 22
 Despite these two journeys from the NLRB to the Supreme Court, the question whether the Rules may lawfully be implemented and enforced by ocean common carriers remains an open one. For, in ILA II, the Court did not confront the issue it had specifically reserved in ILA I: whether the Rules on Containers run afoul of the proscriptions against unreasonable and discriminatory practices with which ocean carriers must comply under the federal shipping laws. Thus, after surviving barrages from multiple legal arsenals, it is clear only that the proponents of the Rules have won an important battle; they have not emerged victorious in this twenty-years' war.
 
 2. Shipping Law Issues
 
 23
 Well before the Supreme Court decided the labor law issues in ILA I and ILA II, the Rules were embattled under the shipping laws before the Federal Maritime Commission. On March 15, 1973, two common carriers, Sea-Land Services, Inc. and Gulf Puerto Rico Lines, Inc., filed with the Commission proposed amended tariffs, which included provisions of the Rules on Containers then in effect. The Commission, acting pursuant to its authority under the Intercoastal Shipping Act, 1933, 46 U.S.C.App. Sec. 843 et seq. (1982), suspended the tariffs and instituted an investigation to determine whether the Rules, if implemented by the carriers, violated specified sections of the Shipping Act, 1916, 46 U.S.C.App. Sec. 813 et seq., and the Intercoastal Act.
 
 
 24
 Hearings were conducted before an Administrative Law Judge (ALJ), who concluded that the Commission properly exercised jurisdiction over the Rules and that the Rules violated all the cited provisions of the shipping laws. Sea-Land Serv., Inc. and Gulf Puerto Rico Lines, Inc.--Proposed Rules on Containers, Initial Decision, 21 F.M.C. 7 (1978). The ALJ noted the "fundamental truth ... that the FMC has jurisdiction over tariffs (rules, rates, etc.) of ocean common carriers," from which it followed "the FMC clearly has jurisdiction over the lawfulness of [the] tariff rules" under investigation. He went on to observe that "unlawful tariff rule discrimination is unlawful tariff rule discrimination, regardless of the fact that it may have been caused by a work preservation rule, and it matters not at all whether the work preservation rule is lawful in and of itself." Id. at 29.
 
 
 25
 The Commission adopted the ALJ's decision, changing only the effective date of the cease and desist order. In discussing the parties' exceptions to that decision, however, the Commission addressed the issue of labor policy considerations in somewhat different terms than had the ALJ. It concluded that
 
 
 26
 the existence of a collective bargaining agreement which affects but is not a part of the transportation aspects of a shipper's relationship with his carrier, need not be given overwhelming priority or weight as a transportation factor by which to justify dissimilarity of treatment [among shippers]. We may agree that such an agreement is a factor to be considered. However, there are other factors. The mere existence of a collective bargaining agreement does not pre-empt those other factors or foreclose our consideration of them.... We do not view the impact of the National Labor Relations Act as permitting a common carrier to disregard entirely its statutory obligations when conducting and resolving labor/management negotiations.
 
 
 27
 Sea-Land Serv., Inc. and Gulf Puerto Rico Lines, Inc.--Proposed Rules on Containers (Sea-Land), 21 F.M.C. 1, 4 (1978) (emphasis in original).
 
 
 28
 The Commission's decision came before this court for review, but the only issue briefed by the petitioners was whether the Commission had jurisdiction to investigate the carriers' tariffs. CONASA, 672 F.2d at 179. The carriers seeking review there argued that practices arising out of the terms of a collective bargaining agreement, even if they must be set forth in the carriers' tariffs, are exempt from Commission scrutiny for either or both of two reasons: (1) the limitations on the Commission's jurisdiction set forth in section 5 of the Maritime Labor Agreements Act of 1980 (the MLAA), 46 U.S.C.App. Sec. 841c; and (2) a nonstatutory labor exemption.
 
 
 29
 We rejected these arguments, holding first that section 6 of the MLAA, which states that that law "shall not affect ... formal Commission proceedings prior to the date of [its] enactment," Pub.L. No. 96-325, 94 Stat. 1021 (1980), rendered the jurisdictional limitations that section 5 placed on the Commission inapplicable to the case. CONASA, 672 F.2d at 182-83. We also found it was unnecessary to determine
 
 
 30
 whether [a] nonstatutory [labor] exemption applies to the substantive provisions of the shipping laws, because the Rules on Containers would not qualify for such an exemption under the definition adopted by the Supreme Court. In 1978 the Court decided, in FMC v. Pacific Maritime Ass'n [(PMA), 435 U.S. 40, 98 S.Ct. 927, 55 L.Ed.2d 96 (1978) ], that an agreement is not exempt if it directly imposes terms on persons or entities outside the agreement.... We conclude that, because enforcement of the Rules on Containers by inclusion in steamship company tariffs imposes terms on third parties, it raises shipping law issues which are within the FMC's statutory responsibilities.
 
 
 31
 Id. at 183.
 
 
 32
 Although we thus concluded that the Commission properly exercised jurisdiction over the Rules in that case, we remanded the matter on the merits. Two important Supreme Court cases bearing on the issues before the Commission had been decided between the Commission's final order and our decision on review. See PMA, supra; ILA I, supra. We thought that, "[i]n the interests of justice, the FMC should have the opportunity to reconsider its previous determination in light of these two decisions." CONASA, 672 F.2d at 189. On remand, the Commission reaffirmed its initial opinion. By order of this court, however, further proceedings in that case were held in abeyance pending the Commission's decision in the investigation presently before us.
 
 C. This Case Before the Commission
 
 33
 After the Supreme Court decided ILA I, the union insisted that all signatory carriers unaffected by the Commission's Sea-Land decision adhere to the practices mandated by the Rules. Many carriers complied, and the Rules were implemented until the Third Circuit enforced an NLRB order requiring carriers to cease and desist from doing so pending its decision on remand in ILA I. Pascarell v. New York Shipping Ass'n, No. 81-13 (D.N.J.), aff'd, 650 F.2d 19 (3d Cir.1981). The Rules were thus implemented only briefly during January and February 1981.
 
 
 34
 This brief implementation of the Rules, however, prompted several complaints from shippers and freight handlers. In response to these complaints, the Commission opened Docket No. 81-11, an investigation naming over 140 carriers as respondents. New York Shipping Association, the Council of North Atlantic Shipping Associations, the Pacific Maritime Association, and the ILA intervened in support of the carriers and of the Rules.
 
 
 35
 In an Interim Report and Order, the Commission identified five basic issues that the investigation was designed to resolve:
 
 
 36
 (1) must practices determining the availability of carrier-controlled containers be published in FMC tariffs; (2) does the [MLAA] alter the Commission's jurisdiction over tariff rates and practices; (3) is Commission regulation of the Container Rules precluded or limited by the policies of the National Labor Relations Act; (4) does the refusal to furnish containers to non-ILA consolidators located within 50 miles of the carrier's pier, or the other Container Rules practices ... violate sections 14 Fourth, 16 First, 17 or 18(a) of the Shipping Act, 1916; and (5) which of the Respondents have implemented or would necessarily implement all or part of the Container Rules.
 
 
 37
 "50-Mile Container Rules Implementation By Ocean Common Carriers Serving U.S. Atlantic and Gulf Coast Ports--Possible Violations of the Shipping Act, 1916, Interim Report and Order, 21 Shpg.Reg.Rep. (P & F) 544, 548 (1982) (hereinafter Interim Report )."
 
 
 38
 The Commission held that because the Rules restrict the shipping public's use of shipping "privileges and facilities," "[t]he basic features of the Container Rules must be published in an ocean carrier's tariff," id. at 554; that under the "tariff matter provision" of the MLAA, jurisdiction over the Rules was expressly conferred upon the Commission; and that the Rules were therefore subject to the substantive provisions of the shipping laws. Id. at 556. The Commission also determined that the Rules did not meet the criteria for immunity from Commission scrutiny under the "nonstatutory labor exemption" recognized in past Commission decisions:
 
 
 39
 The Container Rules have a direct and practical impact upon both labor and shipping interests. Nonetheless, a Commission order prohibiting this particular method of resolving labor/management conflict as an unjust ocean carrier practice would not undermine the basic collective bargaining process created by the National Labor Relations Act, whereas the absence of Shipping Act regulation would eliminate the fundamental premise of the Shipping Act and other common carrier statutes--that similarly situated shippers be treated equally.
 
 
 40
 Id. at 557 (footnote omitted). The Commission referred the remaining issues to an Administrative Law Judge for further hearings.
 
 
 41
 Before the ALJ, the dispute among the parties centered on the extent to which, if any, national labor policy considerations must be taken into account in determining whether the Rules, insofar as they must be set forth in the respondent carriers' tariffs, constituted unreasonable or unjustly discriminatory shipping practices. The ALJ, assaying this conflict, concluded that "[w]hat is needed then is to establish a methodology or criteria to be used in reconciling 'labor policy' with the requirements of the shipping statutes." "50 Mile Container Rules" Implementation By Ocean Common Carriers Serving U.S. Atlantic and Gulf Coast Ports, Initial Decision, 22 Shpg.Reg.Rep. (P & F) 1660, 1680 (1985) (hereinafter Initial Decision ). In fashioning such a methodology, the ALJ concluded that:
 
 
 42
 The problem reduces itself to one of how far the ILA may go in its work preservation efforts before it impermissibly intrudes upon the rights of [others] to conduct their business free of any discrimination or prejudice resulting from the efforts of the ILA. The answer lies in balancing the harm done to [others] against the benefits derived by the ILA.
 
 
 43
 Id. at 1683.
 
 
 44
 The ALJ acknowledged that the disparate treatment of shippers mandated by the Rules could not be justified by transportation considerations, and that his " 'balance of interest' test is not itself without difficulty." Id. at 1684, 1687-88. Nonetheless, the ALJ held that neither the parties urging the Commission to declare the Rules unlawful nor the Commission's Hearing Counsel had demonstrated that the Rules had "any measurable impact" upon the complaining shippers and cargo handlers. Id. at 1684. Without such a showing, he concluded, the Commission and the complainants had failed to carry their evidentiary burden; the Rules, as a consequence, were upheld.
 
 
 45
 In an exhaustive opinion, the Commission reversed the Initial Decision, rejecting the ALJ's "balancing test" as "an illogical and intellectually untenable exercise." 50-Mile Rules, 24 Shpg.Reg.Rep. at 458. The Commission concluded:
 
 
 46
 [O]ur review of the twenty-year history of efforts by this agency, the [NLRB], the courts and Congress to reconcile the demands of the federal maritime and labor statutes indicates that any effort by the Commission to balance "labor considerations" against the clear evidence of unreasonable transportation burdens and discriminations before us would represent a failure by the Commission to discharge the duties assigned to us by Congress, and would undermine the balance between labor and shipping interests devised by Congress when it enacted the Maritime Labor Agreements Act of 1980, Pub.L. No. 96-325, 94 Stat. 1021. We believe that our responsibility to take "labor considerations" into account is limited to ensuring that the appropriate remedy for violations of the Shipping Acts is drawn no more broadly than necessary, so as to avoid any unwarranted impact on the legitimate collective bargaining interests of the carriers and the union.
 
 
 47
 Id. at 415.
 
 
 48
 The Commission also rejected as "inappropriately harsh" the evidentiary burden the ALJ had imposed on the Commission's Hearing Counsel and the complaining shippers. In the Commission's view, unless the complaining parties were seeking reparations, "it is sufficient that the testimony supports and confirms the evidence provided by the text of the Rules themselves." Id. at 460. The Commission went on to note that, in any event, the complainants had adduced substantial evidence of injury. Id. at 461.
 
 
 49
 Applying "traditional transportation factors," the Commission held that the shipping practices mandated by the Rules violated sections 14 Fourth, 16 First, 17 second paragraph, and 18(a) of the 1916 Act; sections 10(b)(6)(C), 10(b)(11)-(12), and 10(d)(1) of the Shipping Act of 1984; and section 4 of the Intercoastal Act. Id. at 468. Petitioners now seek review of these rulings.
 
 
 50
 II. THE COMMISSION'S JURISDICTION OVER THE RULES
 
 
 51
 In March 1982, New York Shipping Association and others filed a petition in this court seeking immediate review of the jurisdictional rulings in the Commission's Interim Report, a petition which we dismissed without prejudice. New York Shipping Ass'n v. FMC, No. 82-1347, Order (D.C.Cir. May 19, 1983). In September 1987, after filing a petition for review of the Commission's final decision on the merits, the petitioners moved to reinstate, and the Commission moved to dismiss, the 1982 petition for review of the Interim Report. We granted the motion for reinstatement, and ordered the parties to file supplemental briefs addressing in more detail both the jurisdictional basis for the Commission's actions and the Commission's motion to dismiss.
 
 A. The Commission's Motion to Dismiss
 
 52
 Preliminarily, petitioners argue that because the Commission did not oppose the motion to reinstate the 1982 petition, it "should not be permitted now ... to raise objections to that motion under the guise of a separate motion to dismiss." The question raised in the Commission's motion goes, however, to the jurisdiction of this court, and as such can be neither foreclosed by the parties nor ignored by the court. See Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 377 n. 21, 98 S.Ct. 2396, 2404 n. 21, 57 L.Ed.2d 274 (1978).
 
 
 53
 The legal principle upon which the Commission relies in its motion to dismiss is that the Interim Report is not a "final order"; that being the case, it is not subject to review in this court under the Administrative Orders Review Act, 28 U.S.C. Sec. 2342(3) (1982).
 
 
 54
 We approach pragmatically the question whether agency action is "final" for purposes of judicial review. See FTC v. Standard Oil of California, 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980); Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Two considerations bear heavily in our analysis. We must determine "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency decision." Port of Boston Marine Term. Ass'n v. Rederi. Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970); see ICC v. Atlantic Coast Line R. Co., 383 U.S. 576, 603, 86 S.Ct. 1000, 1016, 16 L.Ed.2d 109 (1966); Rochester Tel. Corp. v. United States, 307 U.S. 125, 143, 59 S.Ct. 754, 763, 83 L.Ed. 1147 (1939).
 
 
 55
 The Commission argues that review of the Interim Report will disrupt Commission proceedings, and that the only consequences of its order were that the petitioner carriers had to undertake the minimal burden of filing the Rules as part of their tariffs and to participate in the agency investigation.
 
 
 56
 The Commission's argument, however, views the Interim Report in the abstract, floating free in time. The essential fact is that when we reinstated the petition for review of that order in 1987, the Commission had concluded its investigation and had issued a determination on the merits that is indisputably "final." Therefore, in reality, which is time-bound, "there [is] no possible disruption of the administrative process; there [is] nothing else for the Commission to do." Port of Boston Marine Term. Ass'n, 400 U.S. at 71, 91 S.Ct. at 209.
 
 
 57
 Lest we assert our jurisdiction in error, however, we also consider the Commission's argument to be that, upon reinstatement, the petition for review "relates back" to the original filing date, and that the question of finality must be decided under the circumstances then in existence. Again taking a pragmatic--we would not be abashed to say mundane--view of finality, we are constrained to disagree.
 
 
 58
 The earlier petition for review was terminated without prejudice to its renewal; indeed, the show cause order we issued prior to dismissing the petition expressly contemplated that petitioners would be entitled to have the petition reinstated if, but only if, "the final decision of the Commission [did] not otherwise dispose of the issue raised by the petition for review." New York Shipping Ass'n v. FMC, No. 82-1347, Order (D.C. Cir. Feb. 10, 1983). In response, petitioners did not oppose termination of the petition for review, presumably because review of the order would be available at a time when those orders became indisputably final.
 
 
 59
 In its Interim Report, the Commission held that the Rules fall within the "tariff matter provision," and therefore not within the exemption for collective bargaining agreements, of section 5 of the MLAA, 46 U.S.C. Sec. 841c (1982). The Commission's final decision did not "otherwise dispose" of this issue; as a consequence, the conclusions stated by the Commission in its Interim Report merged into the final decision on the merits. See Standard Oil Co. of California, 449 U.S. at 245, 101 S.Ct. at 495. In the present context, therefore, the finality requirement is no bar to this court entertaining the reinstated petition for review.
 
 
 60
 Anticipating this conclusion, the Commission argues in the alternative that because the Interim Report merged into its final decision, the case should be dismissed as an impermissible attempt on the part of the petitioners to split a single cause of action by pursuing review in separate judicial proceedings. Concerns about splitting a single cause of action generally arise when the parties to a lawsuit have obtained a final judgment from a court of competent jurisdiction on some aspect of a claim, but one of those parties, unsatisfied with the judgment, later attempts to litigate an allegedly different claim that arises from facts explored in the prior lawsuit. See RESTATEMENT (SECOND) OF JUDGMENTS Secs. 18-19, 24-25 (1982). Of course, simultaneous litigation of allegedly different claims arising out of single controversy poses many of the same risks as do successive lawsuits that either arise out of a common nucleus of operative fact or involve the application of settled legal issues to substantially identical facts involving the same parties.
 
 
 61
 All such multiplicative proceedings tax an already overburdened judicial system, as well as unfairly burden victors with the costs of meeting the vanquished yet again in legal combat. Worse, two or more courts may reach inconsistent results, subjecting the litigants to conflicting obligations. But we deal with this problem not bluntly, by a general prohibition against fragmented litigation over matters arising out of a single controversy; rather, we rely upon the more discriminating principles of issue and claim preclusion. See generally 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4404 (1981). Where appropriate, devices such as transfer or consolidation may also be usefully employed.
 
 
 62
 In no event, however, is there a jurisdictional bar to fragmented litigation; a defense of preclusion, for example, may be waived. See, e.g., Poulin v. Bowen, 817 F.2d 865, 869 (D.C. Cir.1987). The Commission's failure to oppose the petitioners' motion to reinstate their petition for review, though not precisely a waiver, renders its eleventh-hour motion to dismiss on the basis of an asserted prohibition against splitting a single cause of action considerably less compelling, especially insofar as it invokes the burden on the Commission as a litigant.
 
 
 63
 Moreover, the other drawbacks associated with splitting a single cause of action are simply not present in this case. Both the petition for review of the Commission's Interim Report and the petition for review of the Commission's final order on the merits are being heard in the same court, by the same panel of judges, at the same time; there is no risk of inconsistent judgments, and the inefficient use of scarce judicial resources is of no real concern.
 
 
 64
 We are, furthermore, unable to discern that the Commission will in any way be prejudiced if we allow the petition for review of its jurisdictional conclusions to go forward. We therefore conclude that the Commission's motion to dismiss should be denied.
 
 
 65
 B. The Scope of the Commission's Jurisdiction Under the Maritime Labor Agreements Act
 
 
 66
 The Commission's jurisdiction over carrier practices and agreements arising out of or related to collective bargaining agreements has been a contentious issue for the past twenty years. See generally Godwin & Hilton, A History of FMC Jurisdiction Over Maritime Labor Agreements, 53 TRANSP.PRACT.J. 127 (1986). The knotty legal issues and policy considerations associated with this long-running dispute have been exhaustively considered and discussed, primarily in the context of the Commission's power to review and approve maritime agreements under section 15 of the 1916 Act.
 
 
 67
 Until section 15 of the 1916 Act was superseded by the 1984 Act, carriers were required to file with the Commission certain agreements into which they entered with "another such carrier or other person," 46 U.S.C. Sec. 814 (1982), and the Commission was empowered to
 
 
 68
 disapprove, cancel or modify any agreement ... that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be in violation of this Act, and shall approve all other agreements.
 
 
 69
 Most significantly, section 15 further provided that any such agreement was "lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement...."
 
 
 70
 For many years, the Commission resisted the suggestion that maritime collective bargaining agreements were subject to the pre-implementation filing and approval requirements of section 15. PMA, 435 U.S. at 64, 98 S.Ct. at 941 (Powell, J., dissenting). Subjecting collective bargaining agreements to such procedures might, as Justice Douglas noted, frustrate the collective bargaining process, exposing the parties to "possibly lengthy freezing or stultification of solutions to troublesome labor problems while an intimate part of the proposed agreement is sent to the FMC for approval." Volkswagenwerk v. FMC, 390 U.S. 261, 312, 88 S.Ct. 929, 956, 19 L.Ed.2d 1090 (1968) (Douglas, J., dissenting); see Pacific Maritime Ass'n v. FMC, 543 F.2d 395 (D.C. Cir.1976) (noting that the pre-implementation filing and approval requirements of section 15, if applied to collective bargaining agreements, "make nearly impossible the maintenance or prompt restoration of industrial peace"), rev'd, PMA, supra.
 
 
 71
 Collective bargaining agreements were not categorically exempt from the Commission's jurisdiction under section 15, however. The Supreme Court concluded that
 
 
 72
 Section 15 on its face reaches any contract between carriers "controlling, regulating, preventing, or destroying competition." If a contract is of that nature, it is within the reach of Sec. 15 and subject to the Commission's jurisdiction, and it is quite untenable to suggest that collective-bargaining contracts never control, regulate, prevent, or destroy competition.
 
 
 73
 PMA, 435 U.S. at 53, 98 S.Ct. at 935 (emphasis in original).
 
 
 74
 In 1980 Congress limited the effect of the Court's decision in PMA by enacting the MLAA, Pub.L. No. 96-325, 94 Stat. 1022 (1980) (codified in scattered portions of 46 U.S.C.), section 5 of which provides:
 
 
 75
 The provisions of this chapter and of the Intercoastal Shipping Act, 1933, shall not apply to maritime labor agreements and all provisions of such agreements....
 
 And that:
 
 76
 Notwithstanding the preceding sentence, nothing in this c apter shall be construed as providing an exemption from the provisions of this chapter or of the Intercoastal Shipping Act, 1933, for any rates, charges, regulations, or practices of a common carrier by water in interstate commerce or other person subject to this chapter which are required to be set forth in a tariff, whether or not such rates, charges, regulations or practices arise out of, or are otherwise related to a maritime labor agreement.
 
 
 77
 46 U.S.C. Sec. 841c.
 
 
 78
 The Commission, addressing the jurisdictional limitations of section 5 in its Interim Report, concluded that "the basic features of the Container Rules must be published in an ocean carrier's tariff." Interim Report, 21 Shpg.Reg.Rep. at 554. The agency ruled that a container is a "facility" within the meaning of section 18(b)(1) of the Shipping Act, and explained that a tariff "notifies the shipping public of the 'privileges and facilities' offered by ocean carriers, the conditions applicable to the use of these privileges and facilities, and all rates and charges assessed." Id.; see 46 U.S.C. Sec. 817(b)(1) (describing tariff filing requirements). As a consequence, it concluded that practices in the Rules affecting the provision and use of containers must be published in the signatory carriers' tariffs. Id.[5] It then concluded that
 
 
 79
 although various phrases associated with section 5 are susceptible to more than one interpretation, the language of the entire statute and its legislative history taken as a whole firmly support the conclusion that the MLAA preserves the status quo concerning Shipping Act regulation of labor-related activities under the Shipping Act sections other than section 15. A tariff practice "arising out of or otherwise related to a maritime labor agreement" therefore includes practices described by language taken verbatim from a labor agreement and practices mandated by the terms of the agreement. Any other interpretation would render the second sentence of MLAA section 5 meaningless.
 
 
 80
 Id. at 555. The Commission thus held that notwithstanding the general exemption for maritime labor agreements in the first sentence of section 5, the "tariff matter provision" that follows in the second sentence renders the Rules subject to the Commission's regulatory jurisdiction.
 
 
 81
 The petitioners dispute the Commission's interpretation of section 5. They argue that the statutory language is clear, categorically exempting all maritime labor agreements from all regulation under the shipping laws. They construct the following pair of syllogisms to support their "plain meaning" argument:
 
 Syllogism I
 
 82
 Major premise: Maritime labor agreements are exempt from all provisions of the shipping statutes.
 
 
 83
 Minor premise: The tariff filing requirements of [section] 18 of the 1916 Act, [of section] 2 of the 1933 Act and [of section] 8 of the 1984 Act are provisions of the shipping statutes.
 
 
 84
 Conclusion: Maritime labor agreements are exempt from the tariff filing requirements of the shipping statutes.
 
 Syllogism II
 
 85
 Major Premise: Only matters required to be set forth in a tariff lose the statutory labor exemption.
 
 
 86
 Minor Premise: Maritime labor agreements are not required to be set forth in a tariff (Conclusion of Syllogism I).
 
 
 87
 Conclusion: Maritime labor agreements do not lose their statutory labor exemption.
 
 
 88
 The petitioners contend that giving effect to this "plain meaning" of section 5 would not, as the Commission claimed, render the tariff matter provision meaningless. In their view, that sentence would still apply to unilateral carrier practices that implement collective bargaining agreements such as the Rules, because such unilateral practices are not "maritime labor agreements" within the exemption from FMC jurisdiction provided by the first sentence of section 5.[6] It is thus the Commission's interpretation that does violence to the language of section 5, they argue, because before the MLAA was enacted only two types of labor agreements triggered the Commission's jurisdiction: (1) those that affected carriers' relations with other carriers, which were subject to pre-implementation filing with the Commission and approval under section 15; and (2) those that affected carriers' relations with shippers, which were subject to the tariff filing requirements of section 18 of the 1916 Act. Under the Commission's interpretation, only those agreements subject to section 15 would gain an exemption, even though the first sentence of section 5 on its face extends the exemption for maritime labor agreements to the other provisions of the 1916 Act as well.
 
 
 89
 In Volkswagenwerk v. FMC, supra, the Supreme Court held that "[t]he construction put on a statute by the agency charged with administering it, is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' " Volkswagenwerk, 390 U.S. at 272, 88 S.Ct. at 935 (quoting NLRB v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944) and Unemployment Comm'n v. Aragen, 329 U.S. 143, 153-54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)). More recently, in a series of cases, the Court has clarified the nature of the judicial role in deciding claims that an agency has misinterpreted a statute it is charged with administering. That role is fulfilled by engaging in a two-step analysis. First, using traditional tools of statutory construction, we must determine whether Congress has spoken to the disputed issue with clarity. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If, in step one of that analytic exercise, the court is unable to discern a clear congressional resolution of the disputed issue, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782; see NLRB v. United Food and Commercial Workers Union, Local 23, --- U.S. ----, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1220-21 & n. 29, 94 L.Ed.2d 434 (1987); Continental Air Lines, Inc. v. Department of Transportation, 843 F.2d 1444, 1449 (D.C. Cir.1988).
 
 
 90
 For present purposes, we need not explore the question whether the Commission "administers" the MLAA or, if it does, how rigorously we must scrutinize the Commission's interpretation of section 5 in order to determine whether that interpretation is "permissible" under step two of the analysis mandated by Chevron. Our independent examination of the text of section 5 and its legislative history leads us to conclude that the meaning and purpose of that section can fairly be discerned. In the terms the Supreme Court used in Chevron, we conclude that "Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. Even if it could fairly be said that Congress has not spoken to this issue with utter clarity, moreover, we would be inclined to accept the Commission's interpretation as "reasonable," no matter how strictly that term is applied.
 
 
 91
 In CONASA, we opined that the second sentence of section 5
 
 
 92
 appears to retain existing FMC jurisdiction over the Rules on Containers as applied to shipping customers through steamship tariffs. Explicitly aware of the clash of interests created by the Rules, Congress sought to retain FMC jurisdiction to scrutinize the Rules' adverse effects upon shippers.
 
 
 93
 CONASA, 672 F.2d at 182.
 
 
 94
 To be sure, this passage from CONASA is merely dicta, because the case was resolved under section 6 of the MLAA, which excluded from the reach of section 5 all "formal Commission proceedings commenced prior to the date of enactment" of the MLAA. Id. at 182-83 (quoting MLAA section 6). Having reexamined the text of the statute and its legislative history, we are nonetheless convinced that our original impression was correct.
 
 
 95
 The text of the tariff matter provision makes clear that it qualifies the scope of the exemption in the first sentence. That is the unambiguous meaning of the phrase "notwithstanding the previous sentence." As if to reinforce the qualifying nature of the provision, Congress then stated that "nothing in this section shall be construed as providing an exemption ... for any rates, charges, regulations, or practices of a common carrier ... which are required to be set forth in a tariff, whether or not such rates, charges, regulations, or practices arise out of, or are otherwise related to a maritime labor agreement." Given the "obvious and rational meaning" conveyed by this language--that the exemption simply does not apply if, prior to the MLAA's enactment, the terms of the agreement in question must have been published in a tariff--we readily reject the unnatural interpretation offered by the petitioners. American Trucking Ass'ns v. ICC, 602 F.2d 444, 449-50 (D.C. Cir.1979).
 
 
 96
 The petitioner's syllogisms ignore the qualifying nature of the second sentence, effectively redacting the phrase "notwithstanding the previous sentence." Indeed, their second syllogism turns the statute on its head, treating the first sentence of section 5 as an exception to the provision.
 
 
 97
 We also agree with the Commission that, under the petitioners' construction, the tariff matter provision would add nothing to section 5. As we have noted above, when a carrier unilaterally implements practices mandated by the terms of a collective bargaining agreement, and publishes those practices in its tariff, section 5 does not apply, because unilateral practices are not "maritime labor agreements" as defined in section 2 of the MLAA, 46 U.S.C.App. Sec. 801. It is this definitional limitation, not the tariff matter provision in the second sentence of section 5, that excluded such practices from the concern of the exemption in the first sentence of section 5. Petitioner's interpretation therefore offends the principle that, in construing statutes, one must wherever possible give effect to each word or sentence that the legislature has chosen in expressing its will. Central & Southern Motor Freight Tariff Ass'n v. United States, 757 F.2d 301, 319 (D.C. Cir.1985).
 
 
 98
 Petitioners' argument that the tariff matter provision is limited to unilateral carrier practices is also anomalous in view of MLAA's legislative history and the basic economic considerations underlying its purpose. The original version of section 5 was introduced in the House of Representatives. As we have previously observed, "The House bill removed FMC jurisdiction to review maritime labor agreements, before or after implementation, or to determine their legality under the substantive provisions of the shipping law." CONASA, 672 F.2d at 181 (citing H.R.REP. NO. 876, 96th Cong., 2d Sess. 11 (1980)). The Senate Committee on Commerce, Science, and Transportation, however, agreed with shippers, consolidators, and others that the broad exemption in the House bill "stripped the FMC of jurisdiction to assure equal treatment of shippers, cargo, and localities and to prevent abuses made possible by one [sic] concerted activity of carriers and others." S.REP. NO. 854, 96th Cong., 2d Sess. 10 (1980). This prompted the Senate to propose an amended bill, in the nature of a substitute, that featured the tariff matter provision, "mak[ing] it clear that the exemption granted would not affect the authority of the Commission to exercise authority [sic] over matters which are properly the subject of tariffs required to be filed with the agency, whether or not those matters arise out of a maritime labor agreement." Id. at 14. The revised bill, as thus authoritatively interpreted, was adopted by the Senate without debate, and was passed by the House without further comment on the provision. It is therefore clear that carriers may not, by implementing the terms of a collective bargaining agreement negotiated by a multiemployer bargaining agent, insulate themselves from the Commission's regulatory supervision.
 
 
 99
 Petitioners' approach is not only at odds with the Senate's clear statement, however; it makes no sense, in view of the overall purpose of the Shipping Act, for the tariff matter provision of the MLAA to deprive shippers of any protection except against unilateral carrier practices. The discriminatory potential of unilateral practices is tempered by the availability of alternative means of ocean carriage and the competitive pressures that all carriers exert on the practices of any single carrier. The risk that shippers will be subjected to unreasonable or discriminatory practices therefore increases directly with the number of individual carriers that agree to implement a particular practice that was negotiated with the union by a multiemployer bargaining agent. Such concerted activity, by effectively instituting a regime of adhesion contracts, limits competition among carriers as a "regulator" for the protection of consumers (shippers) and increases their dependence upon the Commission's regulatory authority for their protection. Because the tariff matter provision indicates that the Congress was concerned with the abusive potential inherent in a broad exemption for carrier practices implementing collective bargaining agreements, we cannot ascribe to that body the intention to exclude concerted activity from Commission scrutiny, while preserving the Commission's regulatory authority over the much less threatening practices of a single carrier, absent some clear indication. Such a result would be plainly inconsistent with the manifest purposes of the Shipping Act. See FMC v. Svenska Amerika Linien, 390 U.S. 238, 243, 88 S.Ct. 1005, 1008, 19 L.Ed.2d 1071 (1968) (noting that the shipping laws permit concerted activity among shippers by granting antitrust immunity, but only at the cost of subjecting agreements among carriers to Commission review); Plaquemines Port, Harbor and Term. Dist. v. FMC, 838 F.2d 536, 542-43 (D.C.Cir.1988) (same). It is not surprising that the only relevant legislative history is directly to the contrary.
 
 
 100
 Finally, we cannot accept the petitioners' argument that the Commission's interpretation of the tariff matter provision, which makes section 5 an exemption from section 15 only, frustrates Congress's apparent intent to exempt maritime labor agreements from all the provisions of the shipping laws. In addition to the obvious constraint that the tariff matter provision was intended to have some limiting effect, it would not be incongruous for section 5 to preclude only Commission scrutiny of agreements that would otherwise be subject to the preimplementation filing and approval requirements of section 15. Although we need not decide whether the effect of the exemption is so limited, it is clear that Congress was primarily concerned with the pressures that the procedures of section 15 put on the collective bargaining process. See California Cartage Co. v. United States, 721 F.2d 1199, 1206 (9th Cir.1983). Indeed, the original House bill was drafted as an amendment to section 15, and the House Report states that the legislation was intended primarily "to exclude collective bargaining agreements and certain other related agreements from the filing requirements of Section 15." H.R.REP. NO. 876, supra, at 7.
 
 
 101
 The Senate was narrowly concerned with reversing the Supreme Court's decisions in PMA and Volkswagenwerk. See S.REP. NO. 854, supra, at 7-10. As we have noted above, both of these cases held that, under section 15, carriers could not implement potentially anticompetitive agreements prior to FMC approval, even though they arose out of or were related to collective bargaining agreements.
 
 
 102
 The House bill also included "miscellaneous other deletions of Shipping Act jurisdiction over labor-related matters," id. at 10, however. Opponents of the bill testified before the Senate that those other deletions "went beyond what was necessary to assure free and unfettered collective bargaining...." Id. The Senate agreed, and added the tariff matter provision.
 
 
 103
 Against this legislative and judicial background, we are quite unprepared to say that the Commission's interpretation of the MLAA is inconsistent with Congressional intent. We therefore hold that the Commission properly exercised jurisdiction over the Rules as incorporated in tariffs, and deny the petition for review in No. 82-1347.
 
 III. LABOR POLICY AND THE SHIPPING LAWS
 
 104
 On the merits, the principal dispute between the parties concerns the extent, if any, to which the Commission is required to take "labor policy considerations" into account in determining the validity of the Rules under the Shipping Act. Petitioners have also preserved for review their challenge to the Commission's conclusion that, when only transportation conditions are considered, the tariffs incorporating the Rules are unreasonable and unjustly discriminatory. We briefly consider this latter argument first.
 
 
 105
 The validity of the Rules as tariffs when only transportation conditions are considered has not been briefed thoroughly by any of the parties to this proceeding. The petitioners have, instead, referred us to the brief they filed before the Commission in connection with its review of the ALJ's decision. Consequently, the only arguments before us are directed to the points raised by the Commission's Hearing Counsel and by the opponents of the Rules, and not to the Commission's disposition of them. Nonetheless, we have reviewed petitioners' arguments in light of the FMC's later opinion.
 
 
 106
 Both the ALJ and the Commission held that "[t]he refusal to release containers to consolidators or to accept them without stripping and restuffing [as required by the Rules,] ... since ... unjustified by transportation conditions, would, without more, violate [the shipping laws.]" Initial Decision, 22 Shpg.Reg.Rep. at 1684; see 50-Mile Rules, 24 Shpg.Reg.Rep. at 461-67. The ALJ further concluded:
 
 
 107
 The rules at issue here have as their sole basis the preservation of work for members of the ILA. They are arbitrary in the sense that the nature of the commodity has no bearing on the application of the rules and the conditions of transportation are at best incidental to the purpose of the rule. The Rules were not prompted by conditions attendant to the transportation of cargoes affected by them....
 
 
 108
 Initial Decision, 22 Shpg.Reg.Rep. at 1687.
 
 
 109
 Before the Commission, the petitioners argued that the case made out by the opponents of the Rules suffered from numerous and "pervasive errors" of law, and was unsupported by substantial evidence. Specifically, they argued that (1) NVOs and other entities against which the Rules allegedly discriminate are not "shippers" entitled to the protections of the shipping laws; (2) there was no unlawful "discrimination" because the Rules do not require "disparate treatment" of "similarly situated" entities; (3) those against whom the Rules allegedly discriminate had "failed to establish the injury upon which they predicate their case"; and (4) the opponents failed to prove that the Rules were unreasonable.
 
 
 110
 None of these contentions truly addresses transportation conditions that would justify otherwise discriminatory practices; instead, they challenge the rather obvious conclusions that can be gleaned from examination of the Rules. On their face, the Rules require disparate treatment of various classes of shippers without reference to any transportation needs that even arguably support the distinctions made. We, therefore, find it unnecessary to discuss any of the petitioners' contentions in detail. The Commission's lengthy decision clearly shows that each is utterly without support in Commission precedent or relevant judicial decisions. With respect to the sufficiency of the evidence before the Commission, we agree with the agency that, "[u]nder the circumstances of this case, in which carriers publishing facially discriminatory and burdensome tariffs have not attempted to defend them by reference to transportation considerations, it is sufficient that the testimony supports and confirms the evidence provided by the text of the Rules themselves." 50-Mile Rules, 24 Shpg.Reg.Rep. at 460. Thus, in order to prevail in this case, the petitioners must demonstrate that the Commission erred in confining its inquiry to transportation considerations and refusing to consider labor policies.
 
 
 111
 The petitioners contend that the Commission's refusal to consider labor policies was erroneous for a number of reasons. First, they argue that this issue was definitively resolved by our decision in CONASA and that the Commission is therefore precluded from relitigating it here. Relatedly, petitioners claim that even if principles of issue preclusion do not apply, CONASA and other decisions have demonstrated at least that some consideration of labor policies is required in cases of this type. Finally, they contend that, notwithstanding section 5 of the MLAA, federal agencies have a duty to harmonize diverse statutory programs in such a way as to give effect to the distinct, even conflicting, policies and objectives underlying those programs. In their view, the requirements of the shipping laws, which prohibit only "unreasonable," "unjust," or "unfair" practices and "unjust" or "undue" discrimination, can be interpreted in such a way as to accommodate both shipping policies and labor policies. In refusing to fashion such an accommodation, they argue, the Commission has unlawfully shirked its responsibilities.
 
 
 112
 The Commission, for its part, argues first that this court's decision in CONASA does not control this case, and that in any event, the passage of the MLAA, which by its terms did not apply in CONASA, prohibits it from considering "labor factors" as a justification for carrier practices that otherwise violate the shipping laws as the Commission has historically applied them. Alternatively, the Commission contends that the "labor tests" proposed by the petitioners are unworkable and irreconcilable with the policies of the shipping laws. Finally, assuming that it is required to reconcile the policies of the labor laws with the policies of the shipping laws, the Commission argues that the remedy it has ordered does precisely that because it avoids impinging upon the process of collective bargaining between the ILA and its employers more than is necessary to effectuate the policies of the shipping laws. We consider these opposing arguments in turn.
 
 
 113
 A. Does CONASA control?
 
 
 114
 In CONASA, as we have seen, the court held that the Commission properly exercised jurisdiction over the Rules. We remanded the case, however, because
 
 
 115
 [t]he Commission did not examine the implications of two recent Supreme Court decisions, [PMA ], which asserts the importance of labor policy in reaching substantive shipping law decisions, 435 U.S. at 57 [98 S.Ct. at 937] ... and [ILA I ], which discusses the role of collective bargaining in resolving the problems created by technological job displacement. In the interests of justice, the FMC should have the opportunity to reconsider its previous determination in light of these two decisions.
 
 
 116
 CONASA, 672 F.2d at 189.
 
 
 117
 On remand, the Commission reaffirmed its decision and terminated the proceedings. We then vacated the Commission's order on remand, concluding:
 
 
 118
 It appears that the Commission is now engaged in a "broad scale proceeding examining the lawfulness of practices of numerous carriers ... arising out of the '50-mile rules' contained in the present ... collective bargaining agreements." The Commission has referred that proceeding to an Administrative Law Judge for detailed fact-finding based on a full evidentiary record.
 
 
 119
 Because the information developed in that investigation may shed further light on the shipping law issues involved in [this case], and because action by the Supreme Court [on a petition for certioari in this case] might affect the Commission's jurisdiction over these cases, we vacate the Commission's order that these proceedings be discontinued. The Commission should defer further action [in this case] until it has reached its final decision in its [other investigation] and until the Supreme Court has concluded its action in this case.
 
 
 120
 CONASA, Supplemental Order on Remand, 21 Shpg.Reg.Rep. (P & F) 1057 (D.C.Cir. July 2, 1982).
 
 
 121
 From the order of remand and this supplemental order on remand, petitioners conclude that CONASA "clearly mandated consideration of labor factors" and therefore precludes the Commission from relitigating the matter. They seize upon two footnotes in our initial opinion in CONASA. In one we said that "[a]lthough the legislative standards are different, some of the policy factors germane to the NLRB's decision should also be taken into account by the FMC in its shipping law determination." 672 F.2d at 181 n. 80. In the other, we stated that "[t]he necessity of the collective bargaining provisions at issue is a factor that the FMC should consider in making its substantive determination of legality." Id. at 188 n. 135.
 
 
 122
 The doctrine of issue preclusion forecloses "relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." United States v. Stauffer Chemical Co., 464 U.S. 165, 170-71, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984). An issue of law is "conclusively determined" if, in a prior action between the parties, it has been "actually litigated and determined by a valid and final judgment, and the determination is essential to [that] judgment." Hastings v. Judicial Conference of the United States, 829 F.2d 91, 98 (D.C.Cir.1987) (quoting RESTATEMENT (SECOND) OF JUDGMENTS Sec. 27 (1982)); see also Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); National Treasury Employees Union v. IRS, 765 F.2d 1174, 1176 (D.C.Cir.1985).
 
 
 123
 We cannot agree that CONASA precludes the Commission from litigating the question whether it is required to factor labor policies into its substantive shipping law analysis. That this important question under the shipping laws was not "actually litigated" in CONASA was made plain in our opinion. We explicitly noted that "the merits of the FMC's decision [were] not before us upon review." CONASA, 672 F.2d at 179 n. 67; see id. at 179 ("Petitioners ... have addressed their briefs solely to the jurisdictional question...."). Thus, the court itself neither vetted nor even discussed the implications of PMA and of ILA I in either its initial opinion or its Supplemental Opinion on Remand. We remanded the case, moreover, not because we decided that the Commission had improperly excluded labor policies in its decision on the merits, but because the Commission had not had an opportunity to consider whether intervening Supreme Court decisions required it to accommodate shipping policies to labor policies. Hence, we instructed the Commission to "examine the implications," if any, of the Supreme Court's decisions in PMA and ILA I; we did not order the Commission to apply a legal rule that the court itself discerned from those intervening cases.[7] CONASA was, therefore, not a case in which a remand was necessary because intervening legal developments determined, or even clearly affected, the question in issue, viz. whether the Commission is required to factor labor policies into its substantive shipping analysis.
 
 
 124
 In ILA I, for example, the Supreme Court had expressly declined to consider any shipping law considerations. 447 U.S. at 512, 100 S.Ct. at 2317. In PMA, the Court had noted that "[b]ecause the Commission also has the power to approve filed agreements [under section 15 of the 1916 Act], even though anticompetitive, the Commission may also take into account any special needs of labor-management relationships in the shipping industry." 435 U.S. at 63, 98 S.Ct. at 940 (emphasis added). Plainly, neither of these decisions resolved the issue presently before us.
 
 
 125
 The petitioners also point to representations the Commission made to this court in its motion for summary affirmance of its order discontinuing the CONASA investigation. In that motion, the Commission argued that the investigation reviewed in CONASA was properly discontinued because the agency's newly instituted investigation in Docket No. 81-11, the action presently before this court, "would be a much more appropriate vehicle for any meaningful further action with respect to carriers' implementation of the 50-mile rules." More to the petitioners' point, however, the Commission also stated that "[f]ollowing this Court's opinion ... the 'Interim Report and Order' [in Docket No. 81-11] was modified to ensure that 'the parties may present evidence and otherwise address the nature and extent of any labor policy consideration which might affect the lawfulness of the Container Rules under the sections of the Shipping Acts here at issue....' "
 
 
 126
 Our Supplemental Opinion on Remand, like the initial opinion, makes clear that we did not determine what standards the Commission was required to apply in its investigation; instead, that opinion reflects only our agreement with the Commission that Docket No. 81-11 was a "much more appropriate vehicle" for a complete and thorough examination of the question. See CONASA, Supplemental Opinion on Remand, 21 Ship.Reg.Rep. at 1058. That being the case, we vacated the Commission's admittedly less than thorough decision on that issue on remand. The grounds for our decision in both the initial decision and the Supplemental Opinion on Remand were substantially identical; given the importance of the labor policy issue to the administration of the shipping laws, the Commission had not given appropriate or thorough consideration to the question. The Commission, after considering the effect of intervening legal developments, remained entirely free, as far as the court was concerned, to bring its best judgment to bear in the first instance on the argument that labor policy considerations must play an integral part in its shipping law calculus. The appropriate allocation of authority between agencies and the courts demanded no less, and a fair reading of our opinions in CONASA suggests no more.
 
 
 127
 We proceed to consider petitioners' other objections to the Commission's decision.
 
 
 128
 B. Do Other Precedents Guide?
 
 
 129
 Petitioners, claiming that every court to have addressed the issue has said that labor factors should be taken into account by the Commission, direct our attention to PMA; Volkswagenwerk, 390 U.S. at 283-91, 88 S.Ct. at 941-45 (Harlan, J., concurring); and New York Shipping Ass'n v. FMC, 495 F.2d 1215, 1222 (2d Cir.1974). The first-cited decision endorsed the Commission's practice of exempting certain collective bargaining agreements from the filing requirement of Section 15, in deference to national labor policy; it did not consider whether the Commission is required to analyze non-exempt agreements, or carrier practices implementing them, in any way different than it would other filings under section 15. In Volkswagenwerk, the Court reversed the Commission's decision to exempt from filing under section 15 an agreement among carriers to impose a per-ton charge upon shippers in order to fund an obligation, agreed to in collective bargaining, "to mitigate the impact upon employees of technological unemployment." In his separate opinion, Justice Harlan allowed that the ensuing Commission review "must be circumscribed by the existence of labor problems that it is not equipped to resolve." Volkswagenwerk, 390 U.S. at 287, 88 S.Ct. at 943. Far from indicating that the FMC should specifically consider the labor context underlying a filing, however, Justice Harlan was clear that "[t]he real difficulty in this case is ... to define the Commission's jurisdiction in such a way that ... the Commission will not improperly be brought into labor matters where it does not belong." Id. at 286, 88 S.Ct. at 943.
 
 
 130
 As for New York Shipping Ass'n, the dictum there that labor interests "demand the Commission's continuing attention throughout the process of investigating the status of the agreement under [sections] 16 and 17," and the court's attempt to identify each portion of the agreement as having "relatively more impact on the collective bargaining process and relatively less on competitive conditions in the industry," or vice versa, so that some would be subject to and some exempt from the requirements of the shipping laws, are not helpful either to petitioners or to this court. That was a section 15 case of pre-implementation review of a collective bargaining agreement, a procedure dropped from the law by the 1984 Act because of the problems it created for collective bargaining.
 
 
 131
 In sum, there is no guiding, much less binding, precedent on the point before us.
 
 
 132
 C. Does the MLAA Alter Substantive Shipping Law Analysis?
 
 
 133
 The Commission ruled that, in enacting the MLAA, Congress intended to preclude the agency from considering labor policies under the shipping laws. 50-Mile Rules, 24 Shpg.Reg.Rep. at 440. The petitioners, by contrast, argue that because the MLAA is solely concerned with the scope of the Commission's jurisdiction over matters contained in or related to maritime labor agreements, "[i]t necessarily does not implicate the substantive provisions" of the shipping laws.
 
 
 134
 Not a word in the text of the MLAA supports the view that it bars the Commission from considering labor policies. Indeed, the Commission's argument is essentially that the MLAA implicitly amended the substantive provisions of the shipping laws.[8] Such an indirectly accomplished amendment is not lightly to be inferred, of course, in any case. Cf. Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974). It is quite impossible in this case, where the legislative history clearly demonstrates that Congress intended the MLAA to have no effect on the substantive provisions of the shipping laws.
 
 
 135
 The bill that became the MLAA was introduced in response to complaints from both labor and management that the Supreme Court's decisions in Volkswagenwerk and PMA "undermined the national labor policy of encouraging the peaceful resolution of labor disputes through collective bargaining by transforming such bargaining into a process of adjudicatory confrontation before the Federal Maritime Commission." S.REP. NO. 854, supra, at 9. They therefore argued that maritime labor contracts and all agreements among carriers implementing such contracts should be categorically exempt from the Commission's jurisdiction under section 15 of the 1916 Act. This position was adopted in the House bill. See H.R.REP. NO. 876, supra, at 2 ("This legislation will eliminate the jurisdiction of the FMC to review or require the filing of collective bargaining agreements and agreements incidental to collective bargaining.").
 
 
 136
 Recall, however, that the Senate received testimony from those opposing a blanket exemption from the Commission's jurisdiction for all practices contained in or related to collective bargaining agreements. Such an exemption, they argued, went beyond what was necessary to protect the collective bargaining process and seriously undermined the protections available to shippers under the shipping laws. The Senate responded to these concerns by amending the House bill to include the tariff matter provision. In doing so, the Senate Report stated that, while the purpose of the MLAA is to ensure "that the maritime industry is not deprived of the express national policy of free and unfettered bargaining without government intervention," the tariff matter provision likewise guaranteed that the Commission's "jurisdiction is preserved to the extent necessary to ensure equal treatment of shippers, cargo, and localities, and to prevent abuses made possible by ... concerted activity of ocean carriers and others." S.REP. NO. 854, supra, at 10. The Report went on to emphasize that, in "preserving" the Commission's jurisdiction over tariff matters, "the bill retains the existing protections of the Shipping Act for shippers, carriers and localities which may be adversely affected by shipping practices which may arise out of maritime labor agreements." Id. at 11 (emphasis added). It is thus clear that Congress did not contemplate that the MLAA would effect any substantive change in the shipping law standards to be applied by the Commission in determining the validity of carrier practices that must be published in tariffs. We therefore cannot accept the Commission's argument that the MLAA bars it from considering labor policies under the shipping laws.
 
 
 137
 We note with interest that this is not a case in which the Commission lays claim to any deference for its interpretation under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). In light of the foregoing legislative history, such deference would be inadequate to the Commission's purpose in any event. But it would also be inappropriate for us to defer to the agency where, as here, it is interpreting not the meaning of a statute that Congress has charged it to administer, but rather a statute merely delimiting its jurisdiction as against that of the authorities charged with administration of the labor laws. Judicial deference to an agency's interpretation of a statute is required under Chevron when Congress has not spoken clearly to the precise question the agency must consider in the course of its administration of that statute. While it is true that Congress was silent in the MLAA regarding the Commission's responsibility to accommodate labor policies, the statutes that the Commission "administers" in determining whether carrier practices are "unjust," "undue" or "unreasonable" is not the MLAA but the substantive shipping laws. Thus, congressional silence on this issue in this statute does not make it ambiguous in any way relevant to the issue, and does not authorize the Commission to fetter itself with imaginative interpretations shielded from de novo review.[9]
 
 
 138
 D. Reconciling Labor Policies and Shipping Policies
 
 
 139
 Passing the claim that the MLAA bars consideration of labor matters under the shipping laws, the Commission's alternative argument is that, under those laws, labor policies may be considered only in fashioning an appropriate remedy for practices that cannot be justified by reference to "traditional transportation factors." In other words, labor policies are relevant not to the "liability," but only to the remedial, phase of the proceeding. Before turning to its merits, we address briefly the standard under which we review this interpretation of the shipping laws.
 
 1. Standard of Review
 
 140
 The applicable provisions of the shipping laws make no mention of labor policies; nor does any party maintain that the legislative history of these statutes provides a clear indication of a congressional purpose with respect to the question we must presently answer. Absent some authoritative guidance from Congress, or another controlling consideration, it would seem that our task under the second step in Chevron is to decide only whether the Commission's interpretation of the statutes it is entrusted to administer is a permissible or "reasonable" one.
 
 
 141
 The petitioners argue that the deferential test of Chevron does not apply, however, because the question presented is a "pure question of law." They further contend that the requirements of the shipping laws must be reconciled with the policies of the labor laws, and that the process of doing so is "peculiarly a judicial function, since it requires the weighing and harmonizing of different congressional goals and policies." In their view, we must review the Commission's interpretation of the shipping laws de novo.
 
 
 142
 We do not disagree that the Commission should not trench unnecessarily upon the policies underlying the federal labor laws. When the purposes of the shipping laws it administers can otherwise be accomplished, the Commission must take care not to create tension between the labor and shipping law obligations of carriers. See Burlington Truck Lines v. United States, 371 U.S. 156, 172-74, 83 S.Ct. 239, 247-48, 9 L.Ed.2d 207 (1962). It does not follow, however, that in order to ensure against that possibility we must review the Commission's interpretation of its organic legislation under a more stringent standard of review than is mandated by Chevron.
 
 
 143
 Whatever weight labor policies must be given in this case, the matter under review remains the Commission's application of the shipping laws to the Rules, not a pronouncement on the validity of the Rules under the labor statutes. Although the manner in which the Commission has interpreted the shipping laws may have important consequences for the collective bargaining relationship between the ILA and the carriers, so too may the interpretation given a myriad of laws by many different agencies concerned with such matters as pensions, taxation of benefits, antitrust policy, and so on. In this case, the legality of the Rules as a matter of labor law has been established conclusively by the Supreme Court; there may be many other laws that the Rules, with equal certainty, do not offend. Our concern, and that of the Commission before us, is solely with the requirements of the shipping laws, and such allowance, if any, as the shipping laws make to accommodate national labor policy.
 
 
 144
 Thus, in this case as in any other, the shipping laws "constitute[ ] the immediate frame of reference within which the Commission operates ... and the policies expressed in [them] must be the basic determinants of its action." Denver & R.G.W.R. Co. v. United States, 387 U.S. 485, 493-94, 87 S.Ct. 1754, 1760, 18 L.Ed.2d 905 (1967) (quoting McLean Trucking Co. v. United States, 321 U.S. 67, 80, 64 S.Ct. 370, 377, 88 L.Ed. 544 (1944)). And "[i]t is the Commission that in the first instance must determine whether, because of certain compelling considerations, a carrier is relieved of its usual statutory duty...." See Local 1976, United Bhd. of Carpenters and Joiners, 357 U.S. 93, 109, 78 S.Ct. 1011, 1021, 2 L.Ed.2d 1186 (1958) (hereinafter Sand Door ). That being the case, and because the Commission may not in any event "abandon an independent inquiry into the requirements of its own statute and mechanically accept standards elaborated by another agency under a different statute for wholly different purposes," id. at 111, 78 S.Ct. at 1022, our review remains a matter of checking the Commission against the terms of the shipping laws. This is precisely the type of appellate exercise governed by Chevron; our review must be correlatively deferential.[10]
 
 
 145
 Congress has unmistakeably delegated to the Commission initial authority to resolve the kind of issue before us today, subject to our review for fidelity to the broad purposes of the shipping laws. For, as we have seen, the Rules at issue must be published in a signatory carrier's tariff, and thus, fall within the jurisdiction of the Commission pursuant to section 5 of the MLAA. The Commission has applied the laws it administers to the Rules, and our only task is to determine whether, in doing so, the Commission has interpreted the statute in a manner not in derogation of the Congressional policies it expresses. It matters not whether the issue before us can be characterized as a "pure question of law" or something else; Congress has not spoken to the question, and since it can fairly be characterized as falling within the authority Congress has delegated to the Commission, we are simply not at liberty to substitute our judgment for that of the agency that must administer these laws on a day-to-day basis. United Food and Commercial Workers Union, Local 23, 108 S.Ct. at 426-27 (Scalia, J., concurring); cf. Burlington Truck Lines, 371 U.S. at 169, 83 S.Ct. at 246. "Reasonableness," therefore, is the measure of our review.
 
 
 146
 Nonetheless, this case does differ in one respect from the generality of cases in which we are called upon to review an agency's interpretation of a statute pursuant to Chevron. The FMC "has not been commissioned to effectuate the policies of the [shipping laws] so single-mindedly that it may wholly ignore other and equally important Congressional objectives." Southern Steamship Co. v. NLRB, 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942). As the Supreme Court has repeatedly emphasized, "[f]requently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." Id.; see FTC v. A.P.W. Paper Co., 328 U.S. 193, 202, 66 S.Ct. 932, 936, 90 L.Ed. 1165 (1946); McLean Trucking, 321 U.S. at 80, 64 S.Ct. at 377.
 
 
 147
 Therefore, for its interpretation of the shipping laws to be considered "permissible" or "reasonable," the Commission must adequately explain not only why its interpretation is consistent with the shipping laws, but also why it accomplishes the accommodation required (or, alternatively, why no accommodation is possible), and why any alternative, more accommodating interpretations were rejected.
 
 
 148
 In order to do this, the Commission must identify the relevant labor policies that are to be accommodated, a task quite clearly beyond the Commission's claim of expertise and outside Chevron 's rationale for deferential review. Hence, we give no special deference to its interpretation and identification of those policies. See Sand Door, 357 U.S. at 108-10, 78 S.Ct. at 1020-21; Department of the Treasury v. Federal Labor Relations Authority, 837 F.2d 1163, 1167 (D.C.Cir.1988) ("[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference."); Professional Airways Sys. Specialists v. Federal Labor Relations Authority, 809 F.2d 855, 857 n. 6 (D.C.Cir.1987). It necessarily follows that if the Commission has interpreted the labor laws in a fashion that undervalues or overlooks the policies those laws seek to promote, its attempt to determine whether and to what extent those policies can be reconciled within the framework of the shipping laws cannot be considered reasonable. See Southern Steamship Co., 316 U.S. at 46-48, 62 S.Ct. at 894-95.
 
 
 149
 2. The Commission's "Accommodation" of Labor Policies
 
 
 150
 As we have seen, both the ALJ and the Commission concluded that the Rules were unreasonable and unjustly discriminatory when analyzed, as tariffs must be, under the "transportation considerations" that have historically informed the Commission's substantive shipping law analysis. The ALJ went on to conclude, however, that these violations may be "excused" if: (1) the practices were the product of good faith collective bargaining; (2) the bargaining was over a subject of legitimate labor concern; (3) there was no conspiracy between labor and management; and, most significantly, (4) the resulting harm to shippers from allowing the practices to be implemented is outweighed by the harm to labor interests in enjoining the practices. Initial Decision, 22 Shpg.Reg.Rep. at 1683.
 
 
 151
 On review, the Commission rejected the ALJ's analysis for several reasons. First, relying on cases decided under the Interstate Commerce Act, the Commission noted that
 
 
 152
 common carriers in other transportation modes have not been excused from their statutory obligations on the basis of collective bargaining agreements with their employees.... [A] common carrier may not bargain away such duties in a labor agreement and then defend its actions on the grounds that it served a greater public interest by avoiding a strike and preserving "labor peace."
 
 
 153
 50 Mile Rules, 24 Shpg.Reg.Rep. at 455.
 
 
 154
 Second, the Commission concluded that, in order for "an outwardly discriminatory or burdensome practice" to be considered "reasonable" within the meaning of the shipping laws, it must be justified by "recognized transportation conditions ... such as peculiarities in the nature of the transportation needs of the cargo, competition from other carriers, insufficient cargo to warrant service at a particular port, or conditions at a port or other facility that truly are beyond the carrier's control." In the Commission's view, a "collective bargaining agreement and labor peace on the docks should [not] be considered together with 'traditional' transportation factors in determining whether the Rules are reasonable." To do so "would permit the carriers to bargain with the union without any incentive to safeguard their fundamental common carrier obligations." Id. at 455-56.
 
 
 155
 Finally, the Commission regarded the four-part test used by the ALJ as "contrary to the policies underlying the MLAA, because [it] would require [the agency] to return once again to making findings of fact regarding the collective bargaining process and to rendering interpretations of the National Labor Relations Act." Id. at 456. More fundamentally, however, the Commission rejected the ALJ's purported comparison of benefits and burdens as "totally unworkable" because it "requires the Commission to compare inherently unlike factors, such as labor gains against shipping losses." Id. at 459.
 
 
 156
 Nonetheless, the Commission recognized that it should, if possible, interpret the shipping laws in a manner that gives effect to the policies underlying both these laws and the labor laws. It concluded, however, that in this case, "because the National Labor Relations Act does not apply ... in either its terms or its underlying policies, there exists only ... a 'false conflict' that the FMC is not obliged to resolve by attempting to blend the two bodies of law." Id. at 459. The Commission also concluded that even if it were appropriate to accommodate "labor interests," there was no "reasonable or feasible methodology" by which this could be done, consistent with its obligations under the shipping laws. Id. at 459.[11] The Commission also recognized that any remedy it ordered would affect the collective bargaining relationship between the ILA and the carriers. It concluded that labor policies could be considered in fashioning a remedy, and that the remedy chosen should be "precise and narrowly drawn" so as to minimize the impact upon that relationship.
 
 
 157
 The primary thrust of petitioners' challenge to the Commission's conclusions, as outlined above, is that the exclusion of labor factors from the Commission's analysis prior to its remedial stage creates unnecessary conflict between the shipping laws and the labor laws, in derogation of the Commission's duty to accommodate the two regimes. More specifically, they contend that the Commission's conclusion that the labor laws are not implicated in this case is nothing less than an "ostrich-like denial of reality," because in declaring the Rules unlawful, the Commission effectively "nullified" the rights of ILA members to preserve their work. Such a result, they argue, is necessary neither to vindicate the policies of the shipping laws nor to ensure that the technological efficiencies of containerization are made fully available to the shipping public. They further contend that the Commission's exclusion of labor policies contravenes the Supreme Court's express instructions to administrative agencies in McLean Trucking, 321 U.S. at 80, 64 S.Ct. at 377.
 
 
 158
 [I]n executing th[e] policies [of its organic statute, an agency] may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more, ignore the latter. The precise adjustments which it must make, however, will vary from instance to instance depending on the extent to which Congress indicates a desire to have those policies leavened or implemented in the enforcement of the various specific provisions of the legislation with which the [agency] is primarily and directly concerned.
 
 
 159
 The petitioners point out that in the shipping laws, the relevant portions of which are reproduced in Appendix B to this opinion, Congress chose not to make it unlawful for a carrier to burden or discriminate among shippers under any and all circumstances, but only when the result is "unjust," "undue," or "unreasonable." Thus, they argue, the proscriptions of the shipping laws are not "hard and fast" rules, and a carrier's obligations under those laws are not in any sense "absolute." The capacity and suppleness of the statutory language make it clear, they suggest, that Congress intended that the Commission would make the type of "precise adjustments" for labor policies in its shipping law determinations that the Court held the ICC was required to make for antitrust policies in McLean Trucking. They conclude that
 
 
 160
 since the Rules vindicate work preservation rights guaranteed by Congress, the Commission must uphold them unless they go beyond the realm of reasonableness. Evaluation of reasonableness requires consideration of a variety of factors, including the history of the challenged provisions, the evil they seek to remedy, the underlying reasons for their adoption, the ends they seek to achieve, and the effects of their implementation.
 
 
 161
 In short, the issue before us is the extent to which the Commission must consider petitioners' interests in work preservation when evaluating the reasonableness of the Rules.
 
 
 162
 We discern three types of cases that raise the question whether an agency is required to accommodate the policies of another statutory regime within the framework of the legislation it administers. In the first category, a regulated party argues that conduct that violates the terms of the agency's organic statute is privileged under the terms of another statute. These may be styled "false conflict" cases, because there is no anomaly if conduct privileged under one statute is nonetheless condemned by another; we expect persons in a complex regulatory state to conform their behavior to the dictates of many laws, each serving its own special purpose. In cases of this type, an administrative agency need not make any "accommodation" to the constraints that other laws place upon the regulated person.
 
 
 163
 The second category differs from the first in one critical respect: the regulated party's conduct, in violation of the agency's organic statute, is not merely privileged under another statute; it discharges an affirmative obligation or involves the exercise of a right guaranteed thereunder. The agency enforcing its statute is thus faced with what we shall call a "true conflict," although it is not to be confused with that phrase as it used in other contexts. In such a case, the agency must fully enforce the requirements of its own statute, but must do so, insofar as possible, in a manner that minimizes the impact of its actions on the policies of the other statute.
 
 
 164
 In the third category of cases, an agency is required by its own organic law to consider congressional policies articulated in other statutes. Its mandate to regulate in "the public interest" incorporates an obligation to consult those aspects of the public interest reflected in statutes administered by others. These "incorporation" cases differ from cases of alleged conflict principally in that the question for the court is not whether an agency "accommodation" is required, but whether Congress intended the agency to consult the public interest more broadly than an exclusive focus on the purposes served by its organic legislation would allow.
 
 
 165
 The "false conflict" category is illustrated by a series of cases in which regulated common carriers entered into "hot cargo" agreements with the union representing their employees.[12] In Galveston Truck Line Corp. v. Ada Motor Lines, Inc., 73 M.C.C. 617 (1957), a motor carrier complained to the ICC that connecting trunk-line carriers had refused to accept and forward interline shipments tendered to them by short-line carriers. The trunk-line carriers claimed that their actions were "justified by reason of the [hot cargo] terms of their labor contracts, and the labor situation in existence at the time." 73 M.C.C. at 620. The ICC rejected these arguments, concluding that the carriers
 
 
 166
 gave preferential effect to the demands of the union representatives over their duties and obligations to the public, and their claim that their actions were in the best interests of the public as a whole, in that they were able to continue service to most of their many customers, is shallow indeed, even assuming that they had a right to make a determination as to which customers to serve and which to refuse.
 
 
 167
 Id. at 628.
 
 
 168
 The crucial import of Galveston is that a regulator of common carriers will not condone conduct that violates the terms of its organic statute merely because that conduct may be lawful under another statutory regime. As the ICC noted, "[w]e are here concerned, not with the legality of the 'hot cargo' clauses as such, but with the actions of the defendant carriers in relation to their obligations under the Interstate Commerce Act to the public, without regard to the terms of any contract which they may have executed with a third party." Galveston, 73 M.C.C. at 625-26; see also Merchandise Warehouse Co. v. A.B.C. Freight Forwarding Corp., 165 F.Supp. 67, 76 (S.D.Ind.1958) (carrier must "insist upon contractual terms with the Union that will permit [it] to fulfill i[ts] duties" under applicable regulatory laws); Pickup and Delivery Restrictions, California, Rail, 303 I.C.C. 579, 594 (1958).
 
 
 169
 In Sand Door, the Supreme Court approved and generalized the foundation upon which Galveston rested by emphasizing that the policies of diverse statutory regimes are best preserved if each agency scrupulously avoids deciding questions of law or policy that more properly lie within the jurisdiction of another agency, when a more limited inquiry into the requirements of its own statute is sufficient to dispose of the question before it. Thus, the Court, per Justice Frankfurter, endorsed the ICC's approach:
 
 
 170
 It is significant to note the limitations that the Commission was careful to draw about its decision in the Galveston case. It was not concerned to determine, as an abstract matter, the legality of hot cargo clauses, but only to enforce whatever duty was imposed on the carriers by the Interstate Commerce Act and their certificates. The Commission recognized that it had no general authority to police such contracts, and its sole concern was to determine whether a hot cargo provision could be a defense to a charge that the carriers had violated some specific statutory duty.
 
 
 171
 357 U.S. at 109, 78 S.Ct. at 1021. By the same token, the Court disapproved the NLRB's contention that hot cargo provisions contained in collective bargaining agreements should be deemed unlawful, not solely because of policies underlying the labor laws, but also because, "by entering a contract not to handle the goods the [employer] carrier violates its obligations under the Interstate Commerce Act to provide nondiscriminatory service and to observe just and reasonable practices." Id. at 109, 78 S.Ct. at 1021. The Court approached the question not in terms of whether the NLRB's interpretation of the Interstate Commerce Act was correct, but in terms of its institutional competence to interpret that Act at all:
 
 
 172
 [O]ther agencies of government, in interpreting and administering the provisions of statutes specifically entrusted to them for enforcement, must be cautious not to complicate the [ICC's] administration of its own act....
 
 
 173
 * * *
 
 
 174
 * * *
 
 
 175
 Whether a carrier has without justification failed to provide reasonable and nondiscriminatory service is a question of defining the carrier's duty in the framework of the national transportation policy. Whether there is a "strike or concerted refusal," or a "forcing or requiring" of an employer to cease handling goods is a matter of the federal policy governing labor relations. The Board is not concerned with whether the carrier has performed its obligations to the shipper, but whether the union has performed its obligation not to induce employees in a manner proscribed by [the NLRA]. Common factors may emerge in the adjudication of these questions, but they are, nevertheless, distinct questions involving independent considerations.
 
 
 176
 Id. at 109-10, 78 S.Ct. at 1021.
 
 
 177
 In Burlington Truck Lines, the Court reaffirmed its decision in Sand Door, noting that "[i]mplicit in its analysis is a recognition that if either agency is not careful, it may trench upon the other's jurisdiction, and because of lack of expert competence, contravene the national policy as to transportation or labor relations." 371 U.S. at 173, 83 S.Ct. at 248. Like Galveston, Burlington Truck Lines involved unionized motor carriers' refusal to provide interline service to non-union carriers, pursuant to the hot cargo clauses in their collective bargaining agreements. To meet this situation, the boycotted carriers formed a new company, which then applied to the ICC for authority to act as an interstate motor carrier. The ICC granted the application, finding that the failure of the existing carriers to fulfill their statutory responsibilities justified certificating an additional carrier to serve "the present and future public convenience and necessity." Id. at 161, 83 S.Ct. at 242.
 
 
 178
 The Court did not question the ICC's conclusion that the unionized carriers violated the Interstate Commerce Act by refusing to accept the shipments tendered to them. Indeed, it noted with approval that "[t]he [ICC] declared that it was not attempting to adjudicate a labor dispute or trench upon the jurisdiction of the National Labor Relations Board, and it conceded its lack of jurisdiction to look beyond the duties of carriers to the public under the terms of the Interstate Commerce Act." Id. at 161, 83 S.Ct. at 242. In this respect, therefore, Burlington Truck is indistinguishable from Galveston, and is most appropriately regarded as a "false conflict" case.
 
 
 179
 The Court had noted probable jurisdiction in Burlington Truck not to review the Commission's determination that the carriers' conduct violated the Interstate Commerce Act, however, but "because of important questions raised as to the relationship and interplay between remedies available under the Interstate Commerce Act and under the [NLRA]." Id. at 158, 83 S.Ct. at 241. The ICC might have remedied the service inadequacies by issuing a narrow cease and desist order against carrier obedience to hot cargo agreements.[13] A three judge district court had concluded nonetheless, that although additional certification was the more far-reaching of the remedies available to the ICC, it was
 
 
 180
 a permissible remedy which was not made unavailable merely because the reason for inadequacy of service was that "existing carriers [were] subordinating their public service obligations to their collective bargaining agreements."
 
 
 181
 Id. at 164, 83 S.Ct. at 243 (quoting the district court).
 
 
 182
 Before the Supreme Court, the unionized carriers and the union argued that the ICC's choice of a remedy under the Commerce Act created unnecessary tension with the policies of the NLRA. In essence, they argued that the remedy created a "true conflict" between the two regimes. A cease and desist order, they argued, would have completely remedied the service inadequacies, and thus fully implemented the Commerce Act, without thrusting the ICC into labor relations that more properly lay within the jurisdiction of the NLRB.
 
 
 183
 The Court held that the ICC had failed to provide a reasoned explanation for choosing to certify an additional carrier instead of issuing a cease and desist order--a particularly egregious omission in light of the labor policy arguments presented by the union and the carrier employers. The Court rejected the ICC's argument that a cease and desist order would not have been effective because the unionized carriers' attempt to comply with such an order "might in some way 'so aggravate their labor difficulties as to cause a complete cessation of operations.' " Id. at 169, 83 S.Ct. at 246. The carriers' compliance with hot cargo clauses might make service to the public inadequate.
 
 
 184
 But it was precisely at this point that the Sand Door case ... recognized the power of the [ICC] to entercease-and-desist orders against the carriers' violating the transportation law and their tariffs. Thus, as appellant union argues, there was no reason to have assumed that the ordinary processes of the law were incapable of remedying the situation.
 
 
 185
 Id. at 170, 83 S.Ct. at 247 (footnotes omitted).
 
 
 186
 The Court did not direct the Commission to enter a cease and desist order, however; the intervening change in the law making hot cargo agreements unlawful required a remand to the ICC, and thus it was not necessary for the Court to determine whether the Commission's chosen remedy actually conflicted with the policies of the NLRA. The Court nonetheless instructed:
 
 
 187
 The Commission should be particularly careful in its choice of remedy ... because of the possible effects of its decision on the functioning of the national labor relations policy. The Commission acts in a most delicate area here, because whatever it does affirmatively (whether it grants a certificate or enters a cease-and-desist order) may have important consequences upon the collective bargaining processes between the union and the employer. The policies of the Interstate Commerce Act and the labor act necessarily must be accommodated, one to the other.
 
 
 188
 Id. at 172, 83 S.Ct. at 248.
 
 
 189
 As we read Burlington Truck, an agency, faced with alternative methods of effectuating the policies of the statute it administers, (1) must engage in a careful analysis of the possible effects those alternative courses of action may have on the functioning and policies of other statutory regimes, with which a conflict is claimed; and (2) must explain why the action taken minimizes, to the extent possible, its intrusion into policies that are more properly the province of another agency or statutory regime. Indeed, it was on the heels of its statement that the labor and transportation policies must be "accommodated" that the Court quoted extensively from its opinion in Sand Door. It noted that in that case, "[t]he Court concluded that although 'common factors may emerge in the adjudication of these questions' under the two Acts by the two different agencies, nevertheless independent consideration and resolution were possible," such that each agency could concern itself only with the duties imposed upon carriers by its own statute. Id. at 173, 83 S.Ct. at 248 (quoting Sand Door, 357 U.S. at 111, 78 S.Ct. at 1022).
 
 
 190
 A true conflict is, of course, more difficult to resolve in cases where the alternatives available to an agency do not admit of independent consideration and resolution of the issues raised under its organic statute and under other legislation. In the face of such an irreconcilable conflict, an agency that doggedly excluded consideration of the regime it does not itself administer could, if not actually make it impossible for a regulated entity to conform its behavior to both regimes, at least abrogate the regulated party's rights or obligations under the other regime. In cases of this type, Burlington Truck provides no guidance to the agency.
 
 
 191
 In Southern Steamship Co., however, the Court confronted just such a conflict. Seamen aboard a ship at dock struck to compel their employer to recognize their union. The company refused, and discharged the strikers for mutiny. The NLRB held that the company violated the NLRA by refusing to bargain with the union and by discharging the strikers. It ordered the company, inter alia, to reinstate the discharged strikers with back pay. The Court upheld the Board's ruling that the employer had violated the NLRA by refusing to bargain with the union. It held, nonetheless, that the Board abused its discretion in ordering the company to reinstate the strikers.
 
 
 192
 The Court rejected the Board's remedy because it determined that, under the federal law making mutiny a crime, the strike "was unlawful from its very inception." 316 U.S. at 48, 62 S.Ct. at 895. In Southern Steamship, that is, unlike Galveston, there was a true conflict between the two statutes in question. Under the labor law, the employees had a right to bargain and to strike to enforce that right against a recalcitrant employer; under the mutiny statute, however, it was a crime to exercise the right to strike while on board a vessel in navigable waters. In these circumstances, the Court, although it acknowledged the "considerable breadth" of the Board's authority to impose such remedies "as will effectuate the policies of the [NLRA]," observed that
 
 
 193
 the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.
 
 
 194
 Id. at 47, 62 S.Ct. at 894.
 
 
 195
 This passage might seem to imply that in some cases, the terms of an agency's organic statute must give way in the face of another, equally compelling statutory command. This implication was squarely rejected by the Court, however, in Sand Door:
 
 
 196
 Presumed illegality under the mutiny statute was not used to establish a violation of the labor statute. It was relied on to establish an abuse of discretion in giving a remedy. Much less was there any suggestion that the Board should abandon an independent inquiry into the requirements of its own statute and mechanically accept standards elaborated by another agency under a different statute for wholly different purposes.
 
 
 197
 357 U.S. at 111, 78 S.Ct. at 1022; see also FTC v. A.P.W. Paper Co., 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165 (1946). The lesson of Sand Door is that, where an irreconcilable conflict is presented, the agency should not shrink from pursuing its statutory mandate. Rather, it should attempt to accommodate the policies of the other statute only in fashioning a remedy.
 
 
 198
 The final category, "incorporation" cases, is exemplified by the Supreme Court's decision in McLean Trucking. There the Court reviewed the ICC's approval of a merger among seven large motor carriers, over the Department of Justice's objections that the consolidation would be anticompetitive. The Court held that while the ICC "has no power to enforce the Sherman Act [or to] decide definitively whether the transaction contemplated [by parties subject to ICC regulation] constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act," 321 U.S. at 79, 64 S.Ct. at 377, the agency was nonetheless required to consider competition policy in determining whether a proposed consolidation of motor carriers served the public interest. The breadth of the ICC's statutory mandate, as well as indications that Congress regarded competition in the regulated motor carrier industry as "still a value," required no less. See id. at 85, 64 S.Ct. at 380. At the same time, the ICC was not required or authorized to import antitrust standards wholesale into its substantive analysis implementing the national transportation policy: "the policies of the antitrust laws determine 'the public interest' in [motor carrier] regulation only in a qualified way." Id. at 83, 64 S.Ct. at 378.
 
 
 199
 The [ICC's] task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems. That legislation constitutes the immediate frame of reference within which the [ICC] operates; and the policies expressed in it must be the basic determinants of its action.
 
 
 200
 But in executing those policies the [ICC] may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more, ignore the latter. The precise adjustments which it must make, however, will vary from instance to instance depending on the extent to which Congress indicates a desire to have these policies leavened or implemented in the enforcement of the various specific provisions of the legislation with which the [ICC] is primarily and directly concerned.
 
 
 201
 Id. at 79-80, 64 S.Ct. at 377. Thus, in an incorporation case, it is the requirements of the agency's organic legislation, informed by the use of traditional sources for discerning congressional purpose, that determines the play other statutory policies have in agency adjudications. See California v. FPC, 369 U.S. 482, 484-85, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962); FCC v. RCA Communications, Inc., 346 U.S. 86, 94, 73 S.Ct. 998, 1004, 97 L.Ed. 1470 (1953).
 
 
 202
 As our discussion of these cases demonstrates, in order to determine the extent, if any, to which the FMC is required to accommodate labor policies in its substantive shipping law analysis in this case, we must address the following questions. First, does the Commission's decision that the Rules are unlawful derogate rights secured to the carriers, their employees, or the ILA under the labor laws? If so, is there any other interpretation of the shipping laws that would better preserve these rights without in any way undermining the Commission's statutory mission? Alternatively, if the labor laws do not give any of the petitioners a right to implement the Rules, did Congress intend the Commission to take account, under the broad terms of its organic statutes, of important labor policies arguably served by the Rules?
 
 
 203
 The petitioners and intervenor West Gulf Maritime Association contend that this is not a case of false conflict, like the "hot cargo" cases, which involved labor agreements that could not be enforced against an employer through union self-help. They distinguish those cases as implicating "no established right nor congressional policy embodied in the labor statutes." This is a case, they argue, of true conflict, of incorporation, or of a combination of the two. We agree that, if the labor laws entitle the petitioners to the benefit of the Rules (unlike a hot cargo clause), or if Congress intended labor factors to count under the shipping laws, then this is not a case of false conflict, and the Commission was under a duty to account for labor policies in its decision.
 
 
 204
 The Commission itself clearly regarded this case as involving merely a "false conflict," concluding that its decision in no way undermined rights guaranteed in or the policies underlying the labor laws. It further concluded that its inquiry into the reasonableness of the Rules was strictly limited under the shipping laws to consideration of transportation factors, in which labor considerations play no part. In the terms the Supreme Court used in Burlington Truck, the Commission determined in essence that "independent consideration and resolution" of the shipping law and the labor law issues raised by the Rules were indeed possible. In its brief, the Commission emphasizes that in post-MLAA litigation,
 
 
 205
 there is a bright line between maritime collective bargaining agreements, which are judged by the NLRB under the labor laws without regard to the interests of persons not party to the collective bargaining process, and ocean tariffs resulting from such agreements which, in their application to such outside persons, should be judged by the FMC under the shipping laws in a manner consistent with those statutes' historical purpose of protecting the customers of the carriers and not the carriers themselves.
 
 
 206
 Thus, consistent with Galveston, Sand Door and Burlington Truck, the Commission held that to consider labor factors in its substantive shipping analysis would be inconsistent with its statutory responsibilities. We agree.
 
 
 207
 The labor laws were adopted to promote "the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed.2d 233 (1964). To that end, those laws promote and regulate the collective bargaining process; they most emphatically do not impose upon or guarantee to employers and workers specific terms and conditions of employment. Cf. H.K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). That the employees have a right to bargain to retain work traditionally within their union's jurisdiction--unquestionably a right guaranteed by the labor laws, see ILA I, 447 U.S. at 504, 100 S.Ct. at 2312--does not, as petitioners seem to suggest, guarantee them a substantive right to preserve that work. The carriers were not, under the express or implied terms of the labor laws, obligated to accede to the union's work preservation demands. See 29 U.S.C. Sec. 158(d) (1982) (duty to bargain in good faith "does not compel either party to agree to a proposal ..."). Rather, Congress left the substantive terms and conditions governing the employment relationship to be resolved by the respective parties through the process of collective bargaining, backed by the economic weapons available to them.
 
 
 208
 Courts and administrative agencies therefore "must take great care not to disturb [their] attempts at self-governance unless those attempts contravene the law." International Longshoremen's Ass'n v. NLRB, 613 F.2d 890, 914 (D.C.Cir.1979), aff'd, ILA I, supra. It has never been suggested, however, that the parties' freedom of contract, or the public interest in their maintenance of industrial peace by contract, are themselves factors in determining whether their negotiated product "contravenes the law." It is not the national labor policy to allow otherwise unlawful activity merely because an employer and a union have agreed to it in mandatory collective bargaining. See, e.g., United Mine Workers v. Pennington, 381 U.S. 657, 665, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965) ("because they must bargain does not mean that the agreement reached may disregard other law") (citing Teamsters Union v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959) and Brotherhood of Carpenters v. United States, 330 U.S. 395, 399-400, 67 S.Ct. 775, 777-78, 91 L.Ed. 973 (1947)); see also PMA, 435 U.S. at 71, 98 S.Ct. at 944 (Powell, J., dissenting) ("The parties [to a collective bargaining agreement] cannot agree to terms that violate the law...."). The common carrier obligations of an employer are logically anterior to its duty to bargain, and accordingly, must frame the limits of that bargaining.
 
 
 209
 The Commission's decision does not nullify the rights of the ILA or the carriers under the NLRA. It does not prohibit them from bargaining for the preservation of the ILA's jurisdictional work, nor does it purport to limit in any way the ILA's use of its available economic weapons to force the carriers to agree to its demands on the subject of containerization and work preservation. On the contrary, the Commission limited its inquiry to those carrier practices that affect the carriers' relations with the shipping public, purposefully eschewing any analysis that would require it to regulate the collective bargaining process.
 
 
 210
 This is not to say that the Commission's decision may not affect the relationship between the carriers and the ILA; indeed, it is possible that the parties will be unable to negotiate mutually acceptable work preservation terms that conform to that decision. As we have seen, however, the labor laws do not guarantee them any happier result; if the carriers and the ILA are unable to reach an enforceable agreement on work preservation, it is not because the Commission has failed to "accommodate" labor policies, but only because it has refused to indulge what, in its view, the Congress has clearly proscribed. Cf. Sand Door, 357 U.S. at 110-11, 78 S.Ct. at 1021-22. This case cannot be meaningfully distinguished, therefore, from Galveston, Burlington Truck, and Sand Door, on the ground that the Rules, unlike the hot cargo clauses in those cases, implicate an "established right [or] congressional policy" of work preservation.
 
 
 211
 Nor does the threat of extended labor unrest, and its effects on the carriers' ability to comply with their shipping law obligations, justify the carriers' agreement to implement the allegedly unlawful provisions of the Rules. As the ICC concluded in Galveston:
 
 
 212
 [I]t may not be assumed that any resistence [sic] on the part of the [carriers] to becoming the media through which the objectives of the union were to be accomplished would have provoked a general strike against their entire operations. In any event, if common carriers should be confronted with this dilemma their obligation to continue to render service to all without undue discrimination must be regarded as paramount.
 
 
 213
 * * *
 
 
 214
 * * *
 
 
 215
 To approve the position of [the carriers] would accord them and other carriers similarly situated immunity from violations of the Interstate Commerce Act, and substitute for the regulation of interstate common carriers now vested in this Commission an indirect control by labor organizations.
 
 
 216
 73 M.C.C. at 628-29; see Pickup and Delivery Restrictions, California, Rail, 301 I.C.C. at 593-95. Although labor unrest may make it "impossible or impracticable" for a carrier, exercising due diligence, fully to perform its statutory responsibilities in discrete circumstances, see Quality Drug Stores, Inc. v. Eastern Freight Ways, Inc., 123 M.C.C. 198, 202 (1975), the carriers cannot agree, out of fear of such unrest, to a tariff regime of discriminatory or unreasonable practices. Id. at 203.
 
 
 217
 We must also reject the petitioners' suggestion that the terms of the shipping laws are so capacious that Congress intended that "labor factors" be included in the Commission's shipping law calculus, thus rendering the Commission's narrower interpretation of those laws unreasonable. What we have said above demonstrates that the Commission's decision is not so "inconsistent" or "overlapping" with the policies of the labor laws as to indicate, without more, that Congress may have desired the Commission to consider the extent to which "those policies [should be] leavened or implemented in the enforcement of the various provisions of the [shipping laws]." Cf. McLean Trucking, 321 U.S. at 80, 83-85, 64 S.Ct. at 377, 378-79. Petitioners have not brought to our attention any indications to the contrary in the statutes or their legislative histories.
 
 
 218
 Shipping law terms such as "unjust," or "unreasonable," are indeed broad and may plausibly admit consideration of a number of competing policies. It is well-established, however, that "[t]he primary objective of the shipping laws administered by the FMC is to protect the shipping industry's customers, not members of the industry." Boston Shipping Ass'n v. FMC, 706 F.2d 1231, 1238 (1st Cir.1983). Of the protections afforded shippers under these laws, the prohibition against tariffs that unreasonably discriminate among or impose burdens on them has been identified as one of the Commission's "primary concerns." Pacific Maritime Ass'n v. FMC, 543 F.2d 395, 409 (D.C.Cir.1976), rev'd on other grounds, PMA, supra; see also H.R.REP. NO. 53, 98th Cong., 2d Sess. 4 (1984) ("The primary role of the FMC [is] to review conduct in order to protect carriers, shippers, and ports from unfair or discriminatory shipping practices.").
 
 
 219
 Further informing their meaning, moreover, the prohibitions of the shipping laws against "unjust" or "unreasonable" practices track those of the Interstate Commerce Act, "and where dissimilarities in the respective modes of transportation do not warrant a different construction, the Shipping Act should be construed in the light of similar provisions of the Commerce Act." North Atlantic Mediterranean Freight Conference, 11 F.M.C. 202, 209 (1967) (citing Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952)); see Inter-Island Steam Navigation Co. v. Territory of Hawaii, 305 U.S. 306, 312 n. 9, 59 S.Ct. 202, 205 n. 12, 83 L.Ed. 189 ("In its general scope and purpose, as well as its terms the [Shipping Act] ... closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application and effect."). The decisions of the ICC, as we have discussed above, have held that neither a carrier's obligations under a collective bargaining agreement nor the threat of labor unrest makes reasonable an otherwise unreasonable discrimination in service, regardless of whether the collective bargaining agreement in question is lawful so far as the labor laws are concerned. See Burlington Truck, 371 U.S. at 161, 83 S.Ct. at 242; Galveston, 73 M.C.C. at 625-26. More generally, the Supreme Court has held that the primary purpose of the proscriptions of the Interstate Commerce Act is to "protect[ ] ... those who pay or bear the rates. The standards it establishes are transportation standards, not criteria of general welfare." Texas & P. Ry. v. United States, 289 U.S. 627, 638, 53 S.Ct. 768, 772, 77 L.Ed. 1410 (1933).
 
 
 220
 We think it not unreasonable that the Commission limited the justifications that will render outwardly discriminatory or burdensome practices "reasonable" within the meaning of the shipping laws to similar standards. As we have stated just recently, for an agency's interpretation of its organic statute to be considered permissible under Chevron, that interpretation need only be not "inconsistent with the statutory mandate [and not] ... frustrate the policy that Congress sought to implement." Continental Air Lines, 843 F.2d at 1453 (quoting Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). The petitioners have offered us nothing that suggests the Commission's interpretation has either of these forbidden results. Indeed, if the agency interpreted the shipping laws to admit labor policies in justification for practices that discriminate against or burden certain sectors of the shipping public, with no basis in transportation conditions, then its interpretation might well frustrate the policies of the shipping laws, and hence, be unreasonable under Chevron. Even if the policies of the labor laws extended some affirmative protection to the Rules, there is nothing in the shipping laws that would permit the Commission to give preference to those policies when to do so would undermine Congress's purpose of allowing only such discriminations and burdens on shippers as can be justified by transportation conditions. As the Supreme Court stated in Sand Door, an agency may not "abandon an independent inquiry into the requirements of its own statute and mechanically accept standards elaborated by another agency under a different statute for wholly different purposes." Sand Door, 357 U.S. at 111, 78 S.Ct. at 1022.
 
 
 221
 In addition, it could not be plainer that "independent consideration and resolution" of the labor law issues and shipping law issues that arise from the operation of the Rules is possible. See Burlington Truck Lines, 371 U.S. at 173, 83 S.Ct. at 248; Sand Door, 357 U.S. at 110, 83 S.Ct. at 1021. In ILA I, the Court made it clear that it was unnecessary to consider shipping law policies in determining whether the Rules were a valid work preservation agreement under the labor laws. 447 U.S. at 512, 100 S.Ct. at 2317. As if to underscore that point, the Court specifically admonished the NLRB for considering the effects of the Rules on parties outside the bargaining unit, which the Court said were "irrelevant." Id. at 507 n. 22, 100 S.Ct. at 2315 n. 22. Indeed, in ILA II, the Court repeated that admonition in even stronger terms, stating that the NLRB had "committed [a] fundamental error[ ] ... by focusing on the effect the Rules may have on 'shortstopping' truckers and 'traditional' warehousers, ... contraven[ing] our direction that such extra-unit effects 'no matter how severe,' are 'irrelevant' to the [work preservation] analysis." ILA II, 473 U.S. at 79, 105 S.Ct. at 3056 (quotingILA I, 447 U.S. at 507 n. 22, 100 S.Ct. at 2315 n. 22).
 
 
 222
 Thus, on remand, the ALJ rejected the argument of those opposing the Rules that the carriers did not have the "right of control" over the work in question--an essential element in a proper work preservation analysis under the labor laws--because the carriers could not lawfully comply with the Rules under the terms of the shipping laws; to give effect to FMC precedent "would be mischievous in the present posture of the case." International Longshoremen's Ass'n, Decision and Supplemental Decision, at 72 (NLRB Sept. 29, 1981). He continued:
 
 
 223
 [C]lear guidelines have not been called to [the] attention of this writer suggesting when and under what circumstances one agency should defer to the determination of the other. Hence an extension of comity to FMC in this instance would rest on little more than that Agency's having acted first. Such a fortuity seems a dubious predicate "... for careful accommodation of one statutory scheme to another ..." and for Board abdication "... of its immediate task" and other important rights conferred by the legislature.
 
 
 224
 * * *
 
 
 225
 * * *
 
 
 226
 It may well be that in the final analysis, the adverse impact on shipping interests brought about by the Rules on Containers will be afforded primacy and deemed a controlling element of analysis of [labor law] issues. However, there being no cognizable authority as to which policy serves the public interest in more compelling fashion, reconciliation of the conflict would seem beyond the province of the administrative agencies.
 
 
 227
 Id., at 75 (quoting Southern Steamship Co., 316 U.S. at 47, 62 S.Ct. at 894) (footnote omitted; ellipses in original). On petitions for review, the Fourth Circuit implicitly agreed with the ALJ, see American Trucking Ass'ns v. NLRB, 734 F.2d 966, 976, 978 (4th Cir.1984), aff'd, ILA II, supra, and when the case returned to the Supreme Court, it noted that this issue was not before it. ILA II, 473 U.S. at 70 n. 10, 105 S.Ct. at 3051 n. 10.
 
 
 228
 While we do not agree with the ALJ that there is a true conflict between the labor laws and the shipping laws, we believe his observations are fundamentally sound. Each agency, within the scope of its respective jurisdiction, is concerned with specific legislative policies, and each agency's analysis is defined with reference to those policies. For example, it cannot seriously be disputed that the "extra-unit effects" of the Rules that the Court held were "irrelevant" under the labor laws, are relevant to the Commission's shipping law analysis. The tests proposed by the petitioners and the intervenor concede as much. By the same token, the Commission has no proper concern with the ILA's intention in insisting that the carriers agree to the Rules, which is the critical factor in the labor law determination; the shipping laws are simply not concerned with questions concerning whether labor-management activities are more properly regarded as "primary" or "secondary" activity. Any inquiry into questions of this type would "improperly" thrust the Commission "into labor matters where it does not belong." FMC, 390 U.S. at 286, 88 S.Ct. at 943 (Harlan, J., concurring).
 
 
 229
 The Commission is concerned with the Rules only insofar as they surface as practices in carrier tariffs; it is irrelevant to it that the Rules also perform a different office, insofar as they govern the relationship between the carriers and their employees. Thus, agency scrutiny of the Rules under the labor laws and under the shipping laws, respectively, is not only nonoverlapping; from what can be gleaned from the decisions of the NLRB and of the courts applying the labor laws, they are completely disjunctive.
 
 
 230
 Mindful of both the Supreme Court's efforts in Sand Door and Burlington Truck to ensure that one agency's determinations do not unnecessarily "trench upon" the jurisdiction of another, and of the deference we owe an agency's interpretation of its governing legislation, we conclude that the Commission's decision not to take labor considerations into account except in fashioning a remedy is reasonable.
 
 IV. CONCLUSION
 
 231
 The Commission properly exercised jurisdiction over the Rules as incorporated in the tariffs of the signatory carriers. We have found no error in the Commission's determination that the Rules were unlawful under the shipping laws. We therefore deny both petitions for review.
 
 
 232
 It is so ordered.
 
 APPENDIX A
 
 233
 The relevant portions of the Rules on Containers are as follows:
 
 Definitions
 
 234
 * * *
 
 
 235
 (f) Qualified Shipper--means the manufacturer or seller having a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the export cargo being transported and who is named in the dock/cargo receipt.
 
 
 236
 (g) Qualified Consignee--means the purchaser or one who otherwise has a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the import cargo being transported and who is named in the delivery order.
 
 
 237
 (h) Consolidated Container Load--means a container load of cargo where such cargo belongs to more than one shipper on export cargo or one consignee on import cargo.
 
 
 238
 RULE 1--CONTAINERS TO BE LOADED OR DISCHARGED BY DEEPSEA ILA
 
 LABOR
 
 239
 A) Cargo in containers referred to below shall be loaded into or discharged out of containers only at a waterfront facility by deepsea ILA labor:
 
 
 240
 1. Containers owned, leased or used by carriers ... which contain consolidated container loads, which come from or got to any point within a geographic area of any Management Port described by a 50-mile circle with its radius extending out from the center of each port ... (hereinafter "geographic area") or
 
 
 241
 2. Containers which come from a single shipper which is not the manufacturer ("manufacturer's label") into which the cargo has been loaded (consolidated) by other than its own employees and such containers come from any point within the "geographic area," or
 
 
 242
 3. Containers designated for a single consignee from which the cargo is discharged (deconsolidated) by other than its own employees within the "geographic area" and which is not warehoused in accordance with Rule 2(b).
 
 
 243
 * * *
 
 
 244
 C) All export consolidated cargo, described in 1(A)(1) and (2) above, shall be received at the waterfront facility by deepsea ILA labor and such cargo shall be loaded into a container at the waterfront facility for loading aboard ship.
 
 
 245
 D) All import consolidated cargo described in 1(A)(1) and (3) above, shall be discharged from the container and the cargo placed on the waterfront facility where it will be delivered and picked up by each consignee.
 
 
 246
 E) No carrier or direct employer shall supply its containers to any consolidator or deconsolidator. No carrier or direct employer shall operate a facility in violation of the Rules on Containers which specifically require that all Rule 1 containers be loaded or discharged at a waterfront facility.RULE 2--CONTAINERS NOT TO BE LOADED OR DISCHARGED BY ILA
 
 LABOR
 
 247
 Cargo in containers referred to below shall not be loaded or discharged by ILA labor:
 
 A) Export Cargo:
 
 248
 1. All cargo loaded in containers outside the "geographic area."
 
 
 249
 2. Containers loaded with cargo at a qualified shipper's facility with its own employees.
 
 
 250
 3. Containers loaded with the cargo of a single manufacturer (Manufacturer's label) at its facilities with its own employees.
 
 
 251
 4. Consolidated container loads of mail, household effects of a person who is relocating his place of residence, with no other type of cargo in the container, or personal effects of military personnel.
 
 
 252
 5. There shall be no general warehouse exception applicable to export cargo.
 
 B) Import Cargo:
 
 253
 1. All cargo discharged from containers outside the "geographic area."
 
 
 254
 2. Containers discharged at a qualified consignee's facility by its own employees.
 
 
 255
 3. Consolidated container loads of mail, household effects of a person who is relocating his place of residence, with no other type of cargo in the container, or personal effects of military personnel.
 
 
 256
 4. Containers of a qualified consignee discharged at a bona fide public warehouse within the "geographic area" which comply with all of the foregoing [sic] conditions:
 
 
 257
 1. The container cargo is warehoused at a bona fide public warehouse;
 
 
 258
 2. The qualified consignee pays the normal labor charges in and out; and the normal warehouse storage fees for a minimum period of thirty or more days; and stores the cargo for a minimum period of 30 days; and
 
 
 259
 3. The cargo [is] being warehoused (a) in the normal course of the business of the qualified consignee; (b) title to such goods has not been transferred from the qualified consignee to another.
 
 
 260
 * * *
 
 
 261
 * * *
 
 APPENDIX B
 
 262
 Section 14 Fourth of the Shipping Act, 1916, 46 U.S.C.App. Sec. 812 (1982):
 
 
 263
 No common carrier by water shall ...
 
 
 264
 Fourth. Make any unfair or unjustly discriminatory contract with any shipper based on the volume of freight offered, or unfairly treat or unjustly discriminate against any shipper in the matter of (a) cargo space accommodations or other facilities....
 
 
 265
 Section 16 First of the Shipping Act, 1916, 46 U.S.C.App. Sec. 815 (1982):
 
 
 266
 It shall be unlawful for any common carrier by water ...
 
 
 267
 First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever....
 
 
 268
 Section 17 of the Shipping Act, 1916, 46 U.S.C.App. Sec. 816 (1982):
 
 
 269
 No common carrier by water in foreign commerce shall demand, charge or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports....
 
 
 270
 Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property.
 
 
 271
 Section 18(a) of the Shipping Act, 1916, 46 U.S.C.App. Sec. 817(a) (1982):
 
 
 272
 Every common carrier by water in interstate commerce shall establish, observe, and enforce just and reasonable rates, fares, charges, classifications, and tariffs, and just and reasonable regulations and practices relating thereto and to the ... manner and method of ... delivering property for transportation, ... the facilities for transportation, and all other matters relating to or connected with the receiving, handling, transporting, storing, or delivering of property.
 
 
 273
 Sections 10(b)(6) and 10(b)(11)-(12) of the Shipping Act, 1984, 46 U.S.C.App. Secs. 1709(b)(6)(C) and (b)(11)-(12):
 
 
 274
 (b) No common carrier, either alone or in conjunction with any other person, directly or indirectly, may--
 
 
 275
 (6) except for service contracts, engage in any unfair or unjustly discriminatory practice in the matter of--
 
 
 276
 (C) cargo space accommodations or other facilities, due regard being had for the proper loading of the vessel and the available tonnage;
 
 
 277
 (11) except for service contracts, make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever;
 
 
 278
 (12) subject any particular person, locality, or description of traffic to an unreasonable refusal to deal or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.
 
 
 279
 Section 10(d)(1) of the Shipping Act, 1984, 46 U.S.C.App. Sec. 1709(d)(1):
 
 
 280
 No common carrier, ocean freight forwarder, or marine terminal operator may fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 The petitioners in this proceeding are New York Shipping Association, Inc., the International Longshoremen's Association, the Council of North Atlantic Shipping Associations, Atlantic Container Line Ltd., Dart Containerline Co., Hapag-Lloyd Aktiengesellschaft, "Italia" S.P.A.N., Nedlloyd Lines B.V., Puerto Rico Maritime Shipping Authority, Sea-Land Service, Inc., Transfreight Lines, Inc., and United States Lines
 
 
 [2]
 The petitioners in No. 87-1370 are those in No. 82-1347 and the P & OCL (Trans Freight Lines), Ltd. Intervening in their support is the West Gulf Maritime Association. Intervening in support of the Commission and the United States are the American Trucking Associations, Inc., the American Warehousemen's Association, the National Customs Brokers and Forwarders Association of America, Inc., the International Association of NVOCCs, and the Florida Custom Brokers and Forwarders Association
 
 
 [3]
 One member of the Board of the International Association of NVOs stated in an affidavit submitted to the Commission that the expense of leasing a 20-foot container on a one-way voyage in the North Atlantic trade typically varies from $200-$300
 
 
 [4]
 Restuffing may also result in less efficient use of container space. One consolidator testified that containers delivered to the piers were stripped by longshoremen and restuffed into twice the number of containers
 
 
 [5]
 In CONASA, we noted that "under well established shipping law doctrine, all terms and conditions relating to a carrier's acceptance and carriage of cargo must be set forth in its tariff." 672 F.2d at 182. We noted with approval a previous decision of the Commission holding that the Rules were required to be set forth in a carrier's tariff. Id.; see South Atlantic & Carribean Lines, Inc., 12 F.M.C. 237, 238-42 (1969); see also United States v. Sea-Land Serv., Inc., 424 F.Supp. 1008, 1011, 1012 (D.N.J.1977), appeal dismissed mem., 577 F.2d 730 (3d Cir.1978)
 Before the ALJ, the petitioners disputed whether the Rules must be published in a carrier's tariff, regardless of any effects brought about by the MLAA, but they have not preserved the issue before this court.
 
 
 [6]
 Nothing in the definition of "maritime labor agreements," 46 U.S.C.App. Sec. 801, suggests otherwise
 
 
 [7]
 In his decision, which the petitioners support and the Commission reversed, the ALJ noted that:
 One thing is clear, the Court of Appeals [in CONASA ] was unhappy with the Commission's treatment of the so-called labor issue in Sea-Land. The Court did not, however, give even the slightest hint as to just what it was in the Commission's handling of the issue that caused it concern.
 Initial Decision, 22 Shpg.Reg.Rep. at 1676.
 
 
 [8]
 Prior to the passage of the MLAA, the Commission did not interpret the substantive provisions of the shipping laws to prohibit it from considering labor policies. See Sea-Land, 21 F.M.C. at 4
 
 
 [9]
 As we have said in the more usual but analyticallyindistinguishable context of an agency displaying its creative powers to expand its discretion:
 [I]t seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power. When an agency's assertion of power into new areas is under attack, therefore, courts should perform a close and searching analysis of congressional intent, remaining skeptical of the proposition that Congress did not speak to such a fundamental issue.
 American Civil Liberties Union v. FCC, 823 F.2d 1554, 1567 n. 32 (D.C.Cir.1987); see National Wildlife Federation v. ICC, 850 F.2d 694, 699 n. 6 (D.C.Cir.1988); Kokechik Fisherman's Ass'n v. Secretary of Commerce, 839 F.2d 795, 807 (D.C.Cir.1988) (Starr, J., dissenting); see generally Byse, Judicial Review of Administrative Interpretation of Statutes: An Analysis of Chevron's Step Two, 2 ADMIN.L.J. ---- (forthcoming 1988); Sunstein, Constitutionalism After the New Deal, 101 HARV.L.REV. 421, 467-68 (1987).
 
 
 [10]
 The Supreme Court's pre-Chevron decision in PMA is also instructive, but to the same effect, on the appropriate allocation of interpretive authority between the FMC and reviewing courts in this precise context where the need for harmony with another regime, beyond the special ken of the Commission, is called for:
 ... Congress [committed] to the Commission the initial task of approving or disapproving all agreements that control, regulate, prevent, or destroy competition. However much the courts might consider [the interpretation of the shipping laws] to be a judicial function, particularly when it is necessary to accommodate the possibly conflicting policies of the labor and shipping laws, we have no warrant to ignore congressional preferences written into Sec. 15 of the Shipping Act.
 PMA, 435 U.S. at 61, 98 S.Ct. at 939.
 
 
 [11]
 Analogizing to principles for dealing with conflicts of law, the Commission cited with approval one commentator's suggestion that
 in cases of "true conflicts" that cannot be resolved by restrained interpretations of the discordant statutes, the deciding forum should resolve the case before it by fully applying its own law and the underlying conflict, in a democracy, should be resolved through the political process and not by the courts.
 50-Mile Rules, 24 Shpg.Reg.Rep. at 459 n. 52. See Currie, Notes on Methods and Objectives in the Conflict of Laws, 1959 DUKE L.J. 171, 176.
 
 
 [12]
 Prior to the 1959 amendments to the NLRA, an employer could lawfully agree to a union's demands that it refuse to handle the goods of other employers that the union deemed to be unfair to labor. Unions could not, however, enforce these "hot cargo" agreements through economic pressure on the employer. See Sand Door, 357 U.S. at 106-08, 78 S.Ct. at 1019-20. The 1959 amendments to the NLRA made hot cargo clauses unlawful. See Burlington Truck, 371 U.S. at 171, 83 S.Ct. at 247
 
 
 [13]
 At the time the ICC had rendered its decision, "[t]he union was free to [appeal to carriers not to handle hot cargo,] absent inducement of employees, and as far as the labor laws ... were concerned, the employers were free to reject or accede to such requests." Id. at 170, 83 S.Ct. at 246-47